IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

ERNEST HAYWARD WARD,  :
          :
    Plaintiff,  :
          :  CIVIL CASE NO.
  v.       :  3:17-cv-00183-TCB-RGV
          :
TROUP COUNTY SCHOOL  :
DISTRICT,      :
          :
    Defendant.  :

## MAGISTRATE JUDGE'S SUPPLEMENTAL
## FINAL REPORT, RECOMMENDATION, AND ORDER

Plaintiff Ernest Hayward Ward ("Ward") brings this action against defendant Troup County School District ("the District"), alleging claims of race and sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq. ("Title VII") and 42 U.S.C. § 1981, pursuant to 42 U.S.C. § 1983, and a violation of his First Amendment rights, pursuant to 42 U.S.C. § 1983. [Doc. 30].[1] The District has filed a motion for summary judgment,

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[Doc. 54], which Ward opposes, [Doc. 58], and the District has filed a reply to Ward's response, [Doc. 59].[2]

On January 17, 2020, the undersigned issued a Final Report, Recommendation, and Order, which recommended that the District's motion for

---

[2] Ward also filed a surreply to the District's reply, [Doc. 64], and after the District moved to exclude Ward's surreply, [Doc. 67], Ward filed a motion for leave to file a surreply, [Doc. 68], which the District opposes, [Doc. 69], and Ward filed a reply in support of his motion, [Doc. 70]. "Neither the Federal Rules of Civil Procedure nor this Court's Local Rules authorize the filing of surreplies as a matter of right or in the ordinary course of litigation." Haygood v. Cmty. & S. Bank, No. 1:12–cv–295–WSD, 2012 WL 6681732, at *3 (N.D. Ga. Dec. 21, 2012) (citations omitted); see also Leatherwood v. Anna's Linens Co., 384 F. App'x 853, 857 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted); Graceway Pharm. LLC v. River's Edge Pharm., LLC, Civil Action No. 2:08–CV–0067–RWS, 2009 WL 3753586, at *12 (N.D. Ga. Nov. 6, 2009), aff'd, 380 F. App'x 811 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted). "To allow such surreplies as a regular practice would put the court in the position of refereeing an endless volley of briefs." Garrison v. Ne. Ga. Med. Ctr., Inc., 66 F. Supp. 2d 1336, 1340 (N.D. Ga. 1999), aff'd, 211 F.3d 130 (11th Cir. 2000) (unpublished). "Although the Court may in its discretion permit the filing of a surreply, this discretion should be exercised in favor of allowing a surreply only where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief." Fedrick v. Mercedes-Benz USA, LLC, 366 F. Supp. 2d 1190, 1197 (N.D. Ga. 2005) (citation omitted); see also St. James Entm't LLC v. Dash Crofts, Civil Action No. 1:09-CV-1975-RWS, 2010 WL 2802616, at *1 (N.D. Ga. July 13, 2010) ("Certainly, the Court is disinclined to consider arguments raised in a surreply which could have been raised in an earlier filing."). Although Ward has not provided satisfactory reasons for filing his surreply, the Court will consider it in light of his pro se status as it "does not alter the Court's analysis or its conclusion." Hegre v. Alberto-Culver USA, Inc., 508 F. Supp. 2d 1320, 1327 (S.D. Ga. 2007), aff'd, 275 F. App'x 873 (11th Cir. 2008) (per curiam) (unpublished). Therefore, Ward's motion for leave to file a surreply, [Doc. 68], is **GRANTED**, and the District's motion to exclude Ward's surreply, [Doc. 67], is **DENIED**.

summary judgment be granted.  [Doc. 73]; see also [Doc. 74].  In this Report, Recommendation, and Order, the Court considered the District's objections to the affidavits submitted by Ward and concluded that because Ward's affidavit had not been signed or notarized, and because several of his other affidavits did not include any language indicating that they had been "sworn to" before a notary, they were not properly before the Court and could not be considered.  [Doc. 73 at 3-10].  On January 31, 2020, Ward filed a "Motion for Leave to Amend and Include Affidavits," with which he submitted amended affidavits from six individuals, now including the "sworn to" language, [Doc. 75], and he also filed his objections to the Report, Recommendation, and Order, [Doc. 76], explaining in part that the Court erred in not considering his affidavit because the affidavit he filed was "in fact signed and notarized and sworn to," [id. at 2].  On February 20, 2020, Ward filed a "Statement of Correction for Ward's Affidavit and Request for the Corrected Affidavit to be submitted to Judge Vineyard and Judge Batten," in which he explained that due to a filing error in the Clerk's office, the document was not properly scanned and thus the page showing that his affidavit had been signed and notarized was omitted.[3]  [Doc. 78].

---

[3] The Clerk's office subsequently re-scanned Ward's affidavit so that the entire document, including the signature page, is now available on CM/ECF.  See [Doc. 60-1 (Ward Aff.)].

On February 28, 2020, the Honorable Timothy C. Batten, Sr., United States District Judge for the Northern District of Georgia, granted Ward's motion for leave to amend and include affidavits and referred the case back to the undersigned to issue another Report and Recommendation after considering Ward's affidavit and the affidavits included with Ward's motion.  [Doc. 79]. Having considered these affidavits, for the reasons that follow, it is **RECOMMENDED** that the District's motion for summary judgment, [Doc. 54], be **GRANTED**.[4]

---

[4] In Ward's reply in support of his motion for leave to file a surreply, he has included a request that the Court strike the District's response, [Doc. 70 at 2], which the District has construed as a motion to strike and filed a response in opposition, [Doc. 71], and Ward has filed a reply, [Doc. 72].  "The Court has repeatedly explained that a motion to strike is not the proper vehicle for challenging matters not contained in pleadings, which [Federal Rule of Civil Procedure] 7(a) defines to include complaints, answers and court-ordered replies to answers, but not briefs or supported exhibits."  Chavez v. Credit Nation Auto Sales, Inc., 966 F. Supp. 2d 1335, 1344 (N.D. Ga. 2013), adopted at 1341 (citations omitted).  "Motions to strike are governed by Federal Rule of Civil Procedure 12(f) and apply only to matters contained in a 'pleading,' which Rule 7(a) defines narrowly."  Linscheid v. Natus Med. Inc., Civil Action File No. 3:12-cv-67-TCB, 2015 WL 1470122, at *1 (N.D. Ga. Mar. 30, 2015).  Therefore, to the extent that Ward's reply can be construed as a motion to strike, it is **DENIED** because it seeks to strike a responsive brief, rather than a pleading.  See JP Morgan Chase Bank, N.A. v. Sampson, Civil Action No. 1:10–cv–1666–JEC, 2012 WL 949698, at *2 (N.D. Ga. Mar. 20, 2012) (citation and internal marks omitted) (denying plaintiff's motion to strike defendant's response brief because "[t]he terms of Rules 12(f) and 7(a) make clear that only material included in a *pleading* may be [the] subject of a motion to strike and that motions, *briefs* or memoranda, objections, or affidavits may not be attacked by the motion to strike").

## I. FACTS AND PROCEDURAL HISTORY

**A.**   **Preliminary Procedural Issues**

**1.**   *The Parties' Objections to the Affidavits*[5]

Before addressing the merits of Ward's claims, the Court must first determine whether it may properly consider certain affidavits submitted by the parties.  The District objects to Ward's "affidavits because they are not compliant with the requirements of [Federal] Rule [of Civil Procedure] 56(c)."  [Doc. 64 at 2 (footnote omitted)].  The District argues that several of Ward's affidavits "merely purport to be signed in the presence of a notary, without any 'sworn' language included."  [Id. at 3 (footnote and citations omitted)].  Ward does not respond to these specific arguments, but rather argues that the affidavits are properly based on the declarants' personal knowledge and satisfy the relevance standard of the Federal Rules of Evidence.  [Doc. 66 at 5-8].  Ward has also raised an objection to the District's affidavits, arguing that they contain inadmissible hearsay.  [Id. at 8].

---

[5] The District made several objections to the affidavits submitted by Ward that have now been rendered moot by the filing of amended affidavits, see [Docs. 60-1 & 75], and Judge Batten's Order directing the undersigned to consider the same, [Doc. 79].  Therefore, the Court will restrict its analysis of the District's objections to those affidavits that have not been amended or addressed in Judge Batten's Order, which are the affidavits of Shanovia Daniel ("Daniel"), Lou Ann Hood ("Hood"), Barb McCain ("McCain"), Donna Bivens George ("George"), and Heidi Jones ("Jones").

"When ruling on summary judgment, the Court may consider pleadings, depositions, answers to interrogatories, admissions on file, and affidavits submitted by the parties." Tishcon Corp. v. Soundview Commc'ns, Inc., Civil Action No. 1:04-CV-524-JEC, 2005 WL 6038743, at *3 (N.D. Ga. Feb. 15, 2005) (citing Fed. R. Civ. P. 56(c)). Affidavits are "voluntary declaration[s] of fact[] written down and sworn to by the declarant before an officer authorized to administer oaths, such as a notary public." Yates v. Cobb Cty. Sch. Dist., Civil Action No. 1:15-cv-3211-SCJ, 2016 WL 9444376, at *1 n.2 (N.D. Ga. Aug. 4, 2016), aff'd, 687 F. App'x 866 (11th Cir. 2017) (per curiam) (unpublished) (citations and internal marks omitted); see also Smith v. Nat'l Credit Sys., Inc., CIVIL ACTION FILE NO. 1:13-CV-4219-MHC, 2015 WL 12780446, at *1 (N.D. Ga. May 22, 2015) (citation and internal marks omitted) ("An affidavit is a sworn statement in writing made under oath or an affirmation before a notary public or other authorized officer."). "[U]nsworn statements, even from *pro se* parties, should not be considered in determining the propriety of summary judgment." Holloman v. Jacksonville Housing Auth., No. 06-10108, 2007 WL 245555, at *2 (11th Cir. Jan. 30, 2007) (per curiam) (unpublished) (alteration, citation, and internal marks omitted). However, pursuant to 28 U.S.C. § 1746, "a declaration submitted 'under the penalty of perjury and [signed and] dated' is admissible in lieu of a sworn affidavit." Nu Image, Inc. v. Does 1-3, 932, No. 2:11–cv–545–FtM–29SPC, 2012 WL

1890854, at *5 (M.D. Fla. May 10, 2012), adopted by 2012 WL 1890829, at *3 (M.D. Fla. May 24, 2012) (quoting 28 U.S.C. § 1746).  Such an unsworn declaration must be "signed and dated and include[] language in substantially the following form, 'I declare (or certify, verify, or state) under penalty of perjury . . . that the foregoing is true and correct.'" Tishcon Corp., 2005 WL 6038743, at *3 (alterations in original) (internal marks omitted) (quoting 28 U.S.C. § 1746); see also Matter of Muscatell, 106 B.R. 307, 309 (Bankr. M.D. Fla. 1989) (footnote omitted) ("[A]s long as the unsworn declaration includes the phrase, 'penalty of perjury', and states the document is true, the verification requirements of 28 U.S.C. § 1746 will be satisfied.").

Each of the affidavits submitted by Ward is signed and notarized.  See [Doc. 61 at 3-4 (Hood Aff.), 6-7 (Daniel Aff.), 12 (McCain Aff.), 13 (George Aff.), 16 (Jones Aff.)].  Daniel's affidavit, [id. at 6-7], satisfies the requirements for affidavits because "at the bottom, the notary indicates that the affidavit was sworn to [her]" and "[i]n that sense, the affidavit was not merely signed by [Daniel], but instead sworn to," Butler v. Tremblay, CIVIL ACTION NO. 1:15-CV-03289-LMM, 2017 WL 4422352, at *3 (N.D. Ga. May 9, 2017) (citation omitted).  Therefore, the Court **OVERRULES** the District's objection to Daniel's affidavit.  The remaining affidavits submitted by Ward, however, are deficient in that none of them contain any language suggesting that they were "sworn to" before the notary.  See

generally [Doc. 61 at 3-4, 12-13, 16].   Additionally, none of these "affidavits" constitute declarations under § 1746 because they do not contain language indicating that they were written under penalty of perjury.  See Holloman, 2007 WL 245555, at *4 (finding that the documents offered by plaintiff could not create a genuine issue of fact because none of them "were properly sworn, and none of them were made subject to the penalties of perjury as required by 28 U.S.C. § 1746"); Leslie v. Greene, Civil Action No. 2:12cv58–MHT, 2015 WL 427019, at *7 n.2 (M.D. Ala. Feb. 2, 2015) (citations omitted) ("Because the witness affidavit [plaintiff] submitted was not signed 'under penalty of perjury,' it is not a sworn affidavit or a declaration which can be considered in the determination of [d]efendants' dispositive motions.").   Therefore, the Court **SUSTAINS** the District's objection as to the affidavits of Hood, McCain, George, and Jones, and the Court will not consider those affidavits in ruling on the District's motion for summary judgment.

Turning next to Ward's objections, Ward argues that the affidavits submitted by the District in support of its motion for summary judgment "include hearsay of what others said or reported" and that they "are not provided by the individuals that they claim reported particular incidents."   [Doc. 66 at 8]. However, Ward has not identified the specific affidavits that he contends contain hearsay statements or the specific statements that he believes constitute hearsay.

See [id.].  Based on Ward's arguments, it appears he objects to Dr. Pat Barton's ("Dr. Barton") affidavit, in which she discusses several complaints about Ward that she received from his staff.  See [Doc. 55 (Barton Aff. ¶¶ 5-7, 11-12)].[6]  Because Ward has not identified hearsay statements in the other affidavits submitted by the District, the Court will discuss Ward's objection with respect to Dr. Barton's affidavit only.

Hearsay is "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted."  Edwards v. Nat'l Vision Inc., 568 F. App'x 854, 858 (11th Cir. 2014) (per curiam) (unpublished) (internal marks omitted) (quoting Fed. R. Evid. 801(c)); Carolson v. WellStar Health Sys., Inc., No. 1:12-cv-3439-WSD, 2014 WL 2711924, at *5 n.6 (N.D. Ga. June 16, 2014) (citation omitted).  While the "general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment," Jones v. UPS Ground Freight, 683 F.3d 1283, 1293 (11th Cir. 2012) (citation and internal marks omitted), the Court "may consider a hearsay statement in passing

---

[6] The District has filed a "Notice of Manual Filing," explaining that its affidavits and exhibits in support of its motion for summary judgment were filed manually as several of the documents could not be uploaded to the Court's CM/ECF system because they "exceed the data space permitted for such uploads."  [Doc. 55 at 1-2 (emphasis and all caps omitted)].  This manual filing consisted of four affidavits, each with accompanying exhibits that are referenced therein.  See generally [Doc. 55].  The Court will hereinafter refer to these affidavits and exhibits by citing to this notice of manual filing.

on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form," <u>Saunders v. Emory Healthcare, Inc.</u>, 360 F. App'x 110, 112-13 (11th Cir. 2010) (per curiam) (unpublished) (internal marks omitted) (quoting <u>Macuba v. Deboer</u>, 193 F.3d 1316, 1323 (11th Cir. 1999)). "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." <u>Jones</u>, 683 F.3d at 1294 (citation omitted).

While it is not clear that the challenged statements in the affidavit are offered for the truth of the matters asserted, to the extent that there are hearsay statements contained in Dr. Barton's affidavit concerning complaints from Ward's staff, this evidence can be reduced to admissible evidence at trial by calling the individuals who filed those complaints as witnesses, <u>see</u> <u>Palmer v. Hulett</u>, CIVIL ACTION NO.: 5:16-cv-39, 2018 WL 814553, at *9 (S.D. Ga. Feb. 9, 2018), adopted by 2018 WL 1176847, at *1 (S.D. Ga. Mar. 6, 2018) (footnote omitted) ("While, at the moment, these alleged statements are hearsay and are not contained in the medical record before the Court, these statements can be 'reduced to admissible form at trial', if Plaintiff were to call these doctors as witnesses during the trial of this case[.]"), and Dr. Barton herself could testify to matters contained in her affidavit of which she has personal knowledge, <u>see</u> <u>White v. Cardinal Health, Inc.</u>, CIVIL ACTION NO. 1:05-CV-0057-ODE-ECS, 2006 WL 8431901, at *4 (N.D. Ga. Jan. 23, 2006) (citations

omitted) (explaining that "despite the fact that Melton's declaration contain[ed] out-of-court statements . . . which [were] hearsay, the testimony [was] reducible to admissible form at trial because these witnesses [were] known and could be called to testify at trial" and because "Melton could testify at trial to matters contained in his declaration of which he ha[d] personal knowledge").  Therefore, the Court **OVERRULES** Ward's objection to the District's affidavits.

2.   *Ward's Discovery Dispute*

In his surreply, Ward argues that the District did not comply with its disclosure obligations pursuant to Federal Rule of Civil Procedure 26(a)(1)(a). [Doc. 66 at 3, 8-11].  However, Ward's argument in this document consists entirely of quoted portions of the Federal Rules of Civil Procedure and does not identify the District's conduct which he alleges violated the same.  See generally [id.]. Ward does raise some relevant arguments in his motion for leave to file a surreply, in which he claims that the District "did not release [its] evidence and witnesses during the initial disclosure or during the discovery period," particularly because the District did not provide him with the affidavits or exhibits that it relied on to support its motion for summary judgment until it was filed.  [Doc. 68 at 3-4].

To the extent Ward argues that he did not receive required discovery, he could have filed a motion to compel, see Williams v. Barrett, Civil Action File No. 1:05-CV-2569-TWT, 2008 WL 476122, at *3 (N.D. Ga. Feb. 13, 2008), aff'd, 287 F. App'x 768 (11th Cir. 2008) (per curiam) (unpublished) (noting that "[i]f the

11

Defendant truly thwarted the Plaintiff's discovery, she should have filed a motion to compel," but instead she "belatedly waited to bring the issue to the Court's attention after the close of discovery in [her] responsive brief" and thus her request for relief was untimely), but the time for filing a motion to compel has passed, <u>see</u> LR 37.1(B), NDGa. ("Unless otherwise ordered by the Court, a motion to compel a disclosure or discovery must be filed within the time remaining prior to the close of discovery or, if longer, within fourteen [] days after service of the disclosure or discovery response upon which the objection is based.").  The Court's Scheduling Order set the discovery deadline for the case as July 1, 2019, [Doc. 39 at 1], and the Court subsequently denied Ward's requests to extend the discovery period, [Doc. 49 at 5; Doc. 53 at 2].  Because Ward "has failed to timely bring this issue to the Court and has failed to establish any reasonable cause for the delay, [he] has therefore waived [his] right" to seek relief on this issue.  <u>TIC Park Ctr., 9 LLC v. Cabot</u>, Case No. 16-Civ-24569-COOKE/TORRES, 2018 WL 2688933, at *3 (S.D. Fla. June 5, 2018) (citations omitted).

### 3.   *Compliance with Local Rules Governing Summary Judgment*

"In this District, the process for separating disputed from undisputed material facts is governed by Local Rule 56.1(B)."  <u>Brandon v. Lockheed Martin Aeronautical Sys.</u>, 393 F. Supp. 2d 1341, 1347 (N.D. Ga. 2005), adopted at 1346.[7]  In

---

[7] Specifically, Local Rule 56.1(B)(1) requires the movant to include with its motion and brief "a separate, concise, numbered statement of the material facts to which

compliance with Local Rule 56.1(B)(1), the District, as movant, filed a statement of undisputed material facts, [Doc. 54-2], to which Ward has responded, [Doc. 59]. To the extent that Ward's response "directly refutes the [District's] fact[s] with concise responses supported by specific citations to evidence," LR 56.1(B)(2)(a)(2)(i), NDGa., the Court will consider his response and the corresponding fact will not be deemed admitted; however, the Court will not consider any facts that are not supported by specific citations to evidence, <u>see Shinn v. AMF Bowling Ctr., Inc.</u>, No. 1:07-cv-0235-WSD, 2008 WL 687324, at *1 n.1 (N.D. Ga. Mar. 11, 2008) (citing LR 56.1(B)(1), (B)(2)(b), NDGa.) ("The Court does

---

[it] contends[] there is no genuine issue to be tried," and provides that the Court will not consider any fact that is "not supported by a citation to evidence (including page or paragraph number); [] supported by a citation to a pleading rather than to evidence; [] stated as an issue or legal conclusion; or [] set out only in the brief[.]" LR 56.1(B)(1), NDGa.  In addition, Local Rule 56.1(B)(2) requires the non-moving party to include with the responsive brief "[a] response to the movant's statement of undisputed facts[] . . . [that] contain[s] individually numbered, concise, nonargumentative responses corresponding to each of the movant's numbered undisputed material facts."  LR 56.1(B)(2)(a)(1), NDGa.; <u>see also</u> <u>Williams v. Slack</u>, 438 F. App'x 848, 849 (11th Cir. 2011) (per curiam) (unpublished) (citations omitted).  If the non-moving party fails to respond to a material fact contained in the movant's statement by directly refuting the fact with concise responses supported by specific citations to evidence, stating a valid objection to the admissibility of the fact, pointing out that the movant's citation does not support the movant's fact, or showing that the movant's fact is not material, the fact will be deemed admitted.  <u>See</u> LR 56.1(B)(2)(a)(2), NDGa.; <u>BMU, Inc. v. Cumulus Media, Inc.</u>, 366 F. App'x 47, 49 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted).  Moreover, "[t]he court will deem the movant's citations supportive of its facts unless the respondent specifically informs the court to the contrary in the response."  LR 56.1(B)(2)(a)(3)-(4), NDGa.

not consider any facts not supported by a citation to evidence or facts stated as an issue or legal conclusion."), because even when a *pro se* litigant fails to submit a proper response to a statement of undisputed material facts, those facts must be deemed admitted, see Dinkins v. Leavitt, Civil Action File No. 1:07-CV-486-TWT, 2008 WL 447503, at *3 & n.4 (N.D. Ga. Feb. 13, 2008), adopted at *1, aff'd, 315 F. App'x 171 (11th Cir. 2008) (per curiam) (unpublished) (declining to consider *pro se* plaintiff's response and additional statement of facts where plaintiff completely failed to follow the Local Rules); Hooks v. Bank of Am., Civil Action File No. 1:04-CV-2215-CC, 2005 WL 6074915, at *4 (N.D. Ga. Oct. 6, 2005), adopted at *2, aff'd, 183 F. App'x 833 (11th Cir. 2006) (per curiam) (unpublished) (citations omitted) ("[A]lthough the Court will liberally construe pro se pleadings, *pro se* litigants are still required to conform to the procedural rules."); Brandon v. Lockheed Martin Aeronautical Sys., 393 F. Supp. 2d 1341, 1348 (N.D. Ga. 2005), adopted at 1345 (holding *pro se* litigant to the procedural requirements of Local Rule 56.1). In fact, while "[t]his court recognizes [Ward's] *pro se* status[,]. . . . [his] *pro se* status does not excuse [him] from compliance with applicable procedural rules, including the Rule 56 requirement for non-moving parties." Miller v. Eagle Tug Boat Cos., Civil Action No. 09-00401-CG-B, 2010 WL 4269156, at *6 (S.D. Ala. Oct. 25, 2010) (citations omitted); see also McMahon v. Cleveland Clinic Found. Police Dep't, 455 F. App'x 874, 877 (11th Cir. 2011) (per curiam) (unpublished) (citations and

14

internal marks omitted) ("Although we construe pleadings filed by *pro se* parties liberally, this does not give a court license to serve as *de facto* counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action."); Galloway v. GA Tech. Auth., 182 F. App'x 877, 883 (11th Cir. 2006) (per curiam) (unpublished) (alteration in original) (citations and internal marks omitted) ("Although *[p]ro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and are liberally construed, *pro se* litigants still must comply with the procedural rules governing the proper form of pleadings.").

To the extent that Ward's response incorporates additional facts that do not directly refute those set forth in the District's statement of undisputed material facts, such facts are not properly before the Court as Ward "did not submit a statement of additional facts which [he] contends are material and present a genuine issue for trial," Lewis v. Residential Mortg. Sols., CIVIL ACTION FILE NO. 1:17-CV-1422-ELR-WEJ, 2018 WL 5276221, at *2 (N.D. Ga. Aug. 31, 2018), adopted by 2018 WL 5276190, at *1 (N.D. Ga. Oct. 16, 2018); see also Dant v. Beaulieu of Am., Inc., CIVIL ACTION FILE NO. 4:06-CV-053-RLV-WEJ, 2007 WL 9710721, at *1 (N.D. Ga. Aug. 13, 2007), adopted by 2007 WL 9710774, at *1 (N.D. Ga. Sept. 18, 2007), aff'd, 274 F. App'x 823 (11th Cir. 2008) (per curiam) (unpublished) ("Plaintiffs failed to submit [] additional statements of material facts, instead relying on additional facts stated in their responses to [defendants'

statements of material facts].”), and which “meet[s] the requirements set out in [Local Rule] 56.1(B)(1),” LR 56.1(B)(2)(b), NDGa.  Accordingly, the Court will not consider any additional facts set forth in Ward’s response that are neither supported by a proper citation to evidence nor directly responsive to the District’s statement of facts.[8]  See Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008) (noting that compliance with Local Rule 56.1 is the “only permissible way . . . to establish a genuine issue of material fact” in response to the movant’s assertion of undisputed facts); Morrison v. City of Atlanta, CIVIL ACTION NO. 1:12-cv-02691-AT, 2014 WL 11858147, at *1 (N.D. Ga. Jan. 9, 2014) (citations and internal marks omitted) (“The Eleventh Circuit has observed that Local Rule 56.1 protects judicial resources by [making] the parties organize the evidence rather than leaving the burden upon the district judge.”).

---

[8] Out of an abundance of caution, the District has construed Ward’s response as a statement of additional facts and filed a response thereto as would be required by the Local Rules, see LR 56.1(B)(3) NDGa. (“If respondent provides a statement of additional material facts, then . . . the movant shall file a response to each of the respondent’s facts.”), which includes several objections to Ward’s facts, see generally [Doc. 64-1].  Additionally, although not permitted by the Local Rules, Ward filed a reply to that response.  See [Doc. 65]; see also LR 56.1(A), NDGa. (“In accordance with LR 7.1(C), the parties shall not be permitted to file supplemental briefs and materials . . . except upon order of the Court.”).  The Court will consider the District’s response to the extent that it is responsive to admissible facts proffered by Ward, but it will not consider Ward’s reply as it is not properly before the Court.

The Court accepts as undisputed those facts which Ward admits or has failed to properly dispute or deny, see [Doc. 59, admitting or failing to properly dispute or deny ¶¶ 1, 3-9, 11, 14-16, 18, 23-29, 31-32, 34-37, 39-44, 46, 48-65, 67, 69, 71, and parts of ¶¶ 2, 12-13, 17, 19, 21-22, 30, 33, 38, 68, 70 of the District's statement, Doc. 54-2].  However, the Court has disregarded those facts that are not material or are stated as issues or legal conclusions, see LR 56.1(B)(1)-(2), NDGa.,[9] and, as required on a motion for summary judgment, the Court construes the following pertinent facts of this case in the light most favorable to Ward as the non-moving party, see Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970) (citation omitted); Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003) (per curiam) (citation omitted).[10]

## B.   **Statement of Facts**

Ward, an African American male, [Doc. 62 at 24], has been employed by the District since August 15, 1994, [Doc. 55 (Freeman Ex. 12(a) at 1-12, 27-34, 120), (Freeman Ex. 12(b) at 1-22), (Freeman Ex. 12(d) at 4-18), (Freeman Ex. 12(e) at 1-

---

[9] "The substantive law will identify which facts are material, and material facts are those which are key to establishing a legal element of the substantive claim which might affect the outcome of the case."  Campbell v. Shinseki, 546 F. App'x 874, 877 (11th Cir. 2013) (per curiam) (unpublished) (citation and internal marks omitted).

[10] Accordingly, what follows is a summary of facts as presented by the District in its statement of facts, see [Doc. 54-2], and the Court has also taken additional facts from the pleadings and supporting exhibits in order to fully describe Ward's allegations.

12), (Freeman Ex. 12(f) at 270-88, 297)].  Ward served as the principal of Gardner Newman Middle School ("Gardner Newman") from 2007 to 2012.  [Id. (Freeman Ex. 12(a) at 120)].  For the 2011-2012 school year, Ward implemented changes to the curriculum for gifted students in advanced content classes in an effort to provide non-gifted but academically talented students an opportunity to be placed in advanced content classes along with the gifted students.  [Id. (Cagle Aff. ¶ 3); Doc. 60-1 ¶ 27; Doc. 62 at 115-18].  This change was not well-received by some of the students' parents.  See [Doc. 55 (Cagle Aff. ¶ 3); Doc. 60-1 ¶¶ 30, 32-36].  Ward began receiving complaints from parents, which typically involved concerns that "their child was not in classes with their friends, students that lived in their community, or went to church with them or played on their baseball team." [Doc. 60-1 ¶ 34].  He also had a meeting with one parent who complained that he "had given unfair advantages to the black students and that they did not want their child in classes with those types of students (black students) and that their child did not feel safe in their classes."  [Id. ¶ 35].  After the parents met with Ward, they made phone calls to the District's central office, [id. ¶ 36], and the "District received multiple complaints from parents concerning students qualifying for advanced content classes being removed from those classes, and students being placed into the advanced content classes without meeting the qualifications for the

same," [Doc. 55 (Cagle Aff. ¶ 3)]; see also [id. (Cagle. Ex. 1 at 7-11, 14-17, 19-21, 24)].

In 2012, an elementary school in the District, Unity Elementary School ("Unity") was closed due to budgetary problems and its students were sent to other schools in the District.  [Id. (Cagle Aff. ¶ 4)].  Unity's student population was predominately African American and it served a significant number of impoverished students due to its location near the communities with those populations.  [Id.].  After Unity's closing, Whitesville Road Elementary School ("Whitesville") received many Unity students during the 2012-2013 school year. [Id.].  At this time, because of the complaints from parents at Gardner Newman, Ward was given the option to transfer to Whitesville, a school he was told was struggling with a lack of discipline and academic achievement.  [Doc. 60-1 ¶¶ 51, 58 (citation omitted)].  Whitesville's previous principal, Gretta Wright ("Wright"), had been ineffective at addressing these problems and was transferred to another school.  [Id. ¶ 57].  Ward was subsequently transferred from Gardner Newman to become the principal at Whitesville.  [Doc. 55 (Barton Aff. ¶ 3), (Freeman Ex. 12(a) at 39)].

While Ward served as principal at Whitesville, his supervisor, Dr. Barton, received numerous complaints from teachers regarding his performance and professionalism.  [Id. (Barton Aff. ¶¶ 1-2, 5-7, 11-12), (Barton Exs. 2-4, 8-9)].  During

19

the 2012-2013 school year, out-of-school suspensions at Whitesville accounted for nearly half of the out-of-school suspensions for the District.  [Id. (Barton Aff. ¶ 4), (Barton Ex. 1 at 1)].  Ward reported to his superiors that student discipline was an ongoing problem at Whitesville and requested assistance from the District to help combat it, including hiring an additional administrative staff member and creating an in-school suspension room, but he did not receive this assistance.  [Doc. 60-1 ¶¶ 88-89, 137; Doc. 75 at 3 (Gilbert Aff.), 7 (Cunningham Aff.)].

During the 2012-2013 school year, Ward turned in annual evaluations for six Whitesville teachers without first performing formal classroom observations for them as required by the District's procedures for conducting evaluations.  [Doc. 55 (Barton Aff. ¶ 8), (Barton Ex. 6 at 1)].  Instead, Ward delegated some of his responsibility to observe teachers to the school's Instructional Specialist, Dr. Lynn Short ("Dr. Short"), which he believed he was permitted to do based on his prior experience as an administrator in other schools in the District.  [Doc. 60-1 ¶¶ 72-75, 78-79].  The evaluations that Ward submitted "falsely represent[ed] that he had substantively observed teachers in the classroom as he was required to do[.]" [Doc. 55 (Barton Aff. ¶ 8)].  Ward was issued a letter of directive for this incident and instructed to retract the previously completed evaluations, personally conduct the required observations, and complete new annual evaluations for the affected teachers.  [Id. (Barton Ex. 5 at 1)]; see also [Doc. 60-1 ¶¶ 71, 80-82.

20

Notwithstanding this incident, Ward received a "Satisfactory" rating on his annual evaluation for this school year.  [Doc. 55 (Barton Ex. 7 at 1); Doc. 62 at 28].

All principals in the District are required to submit a School Improvement Plan ("SIP") at the start of each school year "to establish and track goals for the improvements of schools across various criteria" and principals frequently were "asked to revise SIP's that did not contain sufficient detail for measuring school achievement benchmarks."  [Doc. 55 (Cagle Aff. ¶ 8)].  For the 2013-2014 school year, Ward submitted the same SIP that he had the year before, as the plan had been successful to that point.  [Doc. 60-1 ¶¶ 107, 109].  Dr. Barton required Ward to submit a revised SIP, and when she met with him to discuss it, he said, "Tell me what you want me to write, and I'll write it."  [Doc. 55 (Barton Aff. ¶ 13 (internal marks omitted)), (Barton Ex. 10 at 1)].

On October 24, 2013, Ward sent an email to Whitesville staff in which he complained that some teachers had been excessively relying on him to control their classrooms, informed the staff that the administrative team would shortly begin spending three days in each teacher's classroom every week, asked the staff to "prepare [themselves] mentally . . . for this change," and warned that, if they could not accept this change, they could submit their resignation.  [Id. (Barton Ex. 11 at 2-3), (Freeman Ex. 8 at 2-3); Doc. 62 at 35].  At the time Ward sent this email, he "was frustrated at the amount of time that [he] had to spend in particular

classrooms because of the teacher's lack of classroom management." [Doc. 60-1 ¶ 115]. Ward subsequently had a meeting with Dr. Barton and Sequita Freeman ("Freeman"), the Chief Human Resource Officer for the District, to discuss this email, [Doc. 55 (Freeman Aff. ¶ 2), (Barton Ex. 12 at 1), (Freeman Ex. 9 at 1)], after which Ward was issued a Letter of Directive, informing him that he was being placed on a required Professional Development Plan ("PDP"), [id. (Freeman Ex. 8 at 1), (Freeman Ex. 12(a) at 141), (Freeman Ex. 12(f) at 226), (Barton Ex. 11 at 1); Doc. 62 at 44]. As part of this PDP, Ward was required to shadow four elementary school principals with a focus on "[p]lanning and conducting staff meetings; working collaboratively with instructional specialists; conducting classroom walkthroughs; establishing and communicating curriculum and instructional expectations; and, managing time with all administrative tasks." [Doc. 55 (Barton Aff. ¶ 15), (Freeman Aff. ¶ 12), (Freeman Ex. 10), (Freeman Ex. 12(a) at 143-44), (Freeman Ex. 12(c) at 11-12)]. Ward was also required to submit a summary of each job shadow experience. [Id. (Freeman Ex. 10 at 1), (Freeman Ex. 12(a) at 143), (Freeman Ex. 12(c) at 11)]. On March 6, 2014, Ward met with Dr. Barton to discuss his progress on the PDP, and she noted that his performance had been satisfactory. [Doc. 60-1 ¶¶ 129, 150 (citation omitted); Doc. 62 at 49].

On March 27, 2014, Ward received his 2013-2014 annual evaluation in which he once again received an overall "Satisfactory" rating, but received "Needs

Improvement" in the following three performance areas: "[p]lanning and implementing an appropriate curriculum," "[i]mplementing a staff performance evaluation program," and "[c]ommunicating effectively with professional personnel." [Doc. 55 (Freeman Ex. 12(a) at 147, 186), (Freeman Ex. 12(c) at 24-25), (Freeman Ex. 12(f) at 241), (Barton Ex. 13); Doc. 60-1 ¶¶ 130, 135; Doc. 62 at 86]. In response, Ward submitted a grievance to Assistant Superintendent Karen Cagle ("Cagle"), [Doc. 55 (Cagle Aff. ¶ 2)], "regarding [Dr. Barton's] actions that resulted from her misinterpretation and misapplication of the policies and procedures involving the Georgia Leadership evaluation process," [id. (Cagle Ex. 2), (Freeman Ex. 12(b) at 46-50), (Freeman Ex. 12(c) at 81-85), (Freeman Ex. 12(f) at 112-16), (Pugh. Ex. 1); Doc. 62 at 54-58]. Cagle responded by informing Ward that his complaint was not eligible for consideration because a Board of Education policy required that such complaints be filed within ten calendar days of the incident that formed the basis of the complaint, and Ward's complaint had been submitted more than ten calendar days after he received his annual evaluation. [Doc. 62 at 59]. Ward subsequently wrote a letter to Dr. Cole Pugh ("Dr. Pugh"), the Superintendent of the District, [Doc. 55 (Pugh Aff. ¶ 2)], informing him that he was appealing Cagle's denial of his grievance, and arguing that his appeal had been timely submitted because the proper measure of the ten-day requirement was ten working days, not calendar days, [id. (Pugh Ex. 2 at 2-3)]. Dr. Pugh responded by

explaining that Ward's appeal had been denied because, pursuant to the Board of Education's policy, the ten-day requirement had been properly measured using calendar days.  [Id. (Pugh Ex. 2 at 4)].  Ward then wrote Pugh another letter, appealing his denial of the grievance, [Id. (Pugh Ex. 2 at 5-6); Doc. 62 at 79-80], and Dr. Pugh responded, informing Ward that his appeal to the Board of Education was denied, [Doc. 55 (Pugh Ex. 2 at 7-8), (Freeman Ex. 12(b) at 43-44), (Freeman Ex. 12(c) at 87-88)].

On May 14, 2014, Dr. Pugh sent a letter to Ward notifying him that he was not being recommended for re-employment as principal as he did not have tenure as an administrator, and that he was instead being recommended for employment as a classroom teacher for the 2014-2015 school year because he did have tenure as a teacher.  [Id. (Freeman Ex. 12(a) at 131); Doc. 62 at 81].  The Board of Education subsequently voted to approve Dr. Pugh's recommendations, and Ward was reassigned as a physical education teacher in a new school.  [Doc. 55 (Pugh Aff. ¶ 9), (Freeman Ex. 12(a) at 120)].  Debra Brock ("Brock"), an African American female, was hired to replace Ward as principal in the next school year, [id. (Freeman Aff. ¶ 3)], and the District subsequently provided Whitesville with a third administrator and an in-school suspension room, [Doc. 75 at 3, 7]; see also [Doc. 60-1 ¶¶ 137-38 (citation omitted)].

On December 7, 2017, Ward filed this action, initially naming Dr. Pugh, Freeman, Cagle, Dr. Barton, the chair of the Board of Education, and the Board of Education as defendants. [Doc. 1]. The defendants filed a motion to dismiss, [Doc. 8], and Ward filed a motion to add the District as a defendant, [Doc. 13]. On June 12, 2018, the undersigned issued a Report, Recommendation, and Order, granting Ward's motion, recommending that the defendants' motion to dismiss be granted, and instructing Ward to file an amended complaint against the District only, [Doc. 14], and it was adopted by Judge Batten on July 3, 2018, [Doc. 17]. Then, on June 28, 2018, Ward filed his amended complaint against the District, [Doc. 16], which the District moved to dismiss, [Doc. 19], and Ward subsequently filed a motion to amend his complaint, [Doc. 25]. On January 8, 2019, the undersigned issued another Report, Recommendation, and Order, granting Ward's motion to amend in part, and recommending that the District's motion to dismiss be denied as moot, [Doc. 28], which Judge Batten adopted on January 28, 2019, [Doc. 32]. On January 18, 2019, Ward filed his second amended complaint, [Doc. 30], asserting claims for race and sex discrimination and retaliation in violation of Title VII and in violation of § 1981, pursuant to § 1983, and a claim for a violation of the First Amendment, pursuant to § 1983, [id. at 44-67 ¶¶ 1-36]. The District has filed a motion for summary judgment, [Doc. 54], which Ward opposes, [Doc. 58]. The District's motion for summary judgment, [Doc. 54], having been fully briefed, and with

25

consideration of the affidavits per the Order of February 28, 2020, [Doc. 79], is ripe for ruling.

## II.  SUMMARY JUDGMENT STANDARD

In deciding a motion for summary judgment, the Court views all evidence in the light most favorable to and draws all reasonable inferences in favor of the non-moving party.  Adickes, 398 U.S. at 157; Cargo v. Ala., Bd. of Pardons & Parole Div., 391 F. App'x 753, 754 (11th Cir. 2010) (per curiam) (unpublished); Knight, 330 F.3d at 1316.  "Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law."  McCurdy v. DeKalb Cty., Civil Action File No. 1:09-CV-1989-TWT, 2010 WL 5101405, at *1 (N.D. Ga. Dec. 8, 2010) (citing Fed. R. Civ. P. 56(c)); see also Young v. FedEx Express, 432 F. App'x 915, 916 (11th Cir. 2011) (per curiam) (unpublished); Penley v. Eslinger, 605 F.3d 843, 848 (11th Cir. 2010).

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact, upon which the non-moving party must then submit specific facts showing a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Bagwell v. Peachtree Doors & Windows, Inc., Civil Action File No. 2:08–CV–0191–RWS-SSC, 2011 WL 1497831, at *10 (N.D. Ga. Feb. 8, 2011), adopted by 2011 WL 1497658, at *1 (N.D.

Ga. Apr. 19, 2011); Premier Assocs., Inc. v. EXL Polymers, Inc., No. 1:08-cv-3490-WSD, 2010 WL 2838497, at *8 (N.D. Ga. July 19, 2010), aff'd, 507 F. App'x 831 (11th Cir. 2013) (unpublished).  "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Jackson v. B & L Disposal, Inc., 425 F. App'x 819, 820 (11th Cir. 2011) (per curiam) (unpublished) (alteration in original) (citation and internal marks omitted); see also Shuler v. Ingram & Assocs., 441 F. App'x 712, 715 (11th Cir. 2011) (per curiam) (unpublished); Bryant v. U.S. Steel Corp., 428 F. App'x 895, 897 (11th Cir. 2011) (per curiam) (unpublished).  "Speculation or conjecture cannot create a genuine issue of material fact."  Shuler, 441 F. App'x at 715 (citation omitted); see also Howard v. Or. Television, Inc., 276 F. App'x 940, 941 (11th Cir. 2008) (per curiam) (unpublished) (emphasis, citation, and internal marks omitted) ("Speculation does not create a genuine issue of fact."); Goodman v. Ga. Sw., 147 F. App'x 888, 891 (11th Cir. 2005) (per curiam) (unpublished) (citation and internal marks omitted) ("[A]ll reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an inference based on speculation and conjecture is not reasonable.").  "Moreover, the non-moving party cannot create a genuine issue through evidence that is 'merely colorable' or 'not significantly probative.'" Morales v. Ga. Dep't of Human Res., 446 F. App'x 179, 181 (11th Cir. 2011) (per

curiam) (unpublished) (citation omitted).  And, "[a] dispute over a fact will only preclude summary judgment if the dispute might affect the outcome of the suit under the governing law."  <u>Penley</u>, 605 F.3d at 848 (citation and internal marks omitted); <u>see also</u> <u>Ivey v. First Quality Retail Servs.</u>, Civil Action No. 5:09–CV–333 (MTT), 2011 WL 1671927, at *3 (M.D. Ga. May 3, 2011), <u>aff'd</u>, 490 F. App'x 281 (11th Cir. 2012) (per curiam) (unpublished) (citations omitted).  "But, [w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, summary judgment for the moving party is proper."  <u>Premier Assocs., Inc.</u>, 2010 WL 2838497, at *9 (alteration in original) (citation and internal marks omitted).

Finally, while "[*p*]*ro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed[,] . . . . a pro se litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment."  <u>Nalls v. Coleman Low Fed. Inst.</u>, 307 F. App'x 296, 298 (11th Cir. 2009) (per curiam) (unpublished) (citations and internal marks omitted); <u>see also</u> <u>Cornelius v. Home Comings Fin. Network, Inc.</u>, 293 F. App'x 723, 727 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted).  Thus, while leniency is shown to *pro se* litigants, the Court "will not

serve as de facto counsel or rewrite an otherwise deficient pleading in order to sustain an action." Nalls, 307 F. App'x at 298 (citation and internal marks omitted).

## III.  DISCUSSION

Ward alleges that the District engaged in intentional race and sex discrimination and retaliated against him for opposing race discrimination against students in the District and for filing a grievance against his supervisor in violation of both Title VII and § 1981, and further asserts that his First Amendment free speech rights were violated when Dr. Pugh denied the appeal of his grievance to the Board of Education.  [Doc. 30 at 44-67 ¶¶ 1-36].   The District moves for summary judgment, arguing that Ward cannot maintain his § 1981 and First Amendment causes of action pursuant to § 1983 because he has failed to identify an official District policy that resulted in a constitutional violation, [Doc. 54-1 at 5-6]; that Ward's race and sex discrimination claims fail because he was not treated less favorably than any similarly situated comparators and because the District had legitimate, non-discriminatory reasons for its decisions, [id. at 7-14]; that Ward's retaliation claims must fail because he did not engage in any protected activity and because the District had legitimate, non-retaliatory reasons for its actions, [id. at 15-22]; and that there has been no First Amendment violation

because Ward was not speaking as a private citizen on a matter of public concern

when he filed his grievance against Dr. Barton, [id. at 22-24].[11]

## A.    Violation of § 1981, Pursuant to § 1983

In support of Ward's § 1981 claims, which he brings against the District

pursuant to § 1983, Ward alleges that "[i]t has been a custom of the . . . District to

hire very few black male principals and to remove them from the positions of

principal by demotion." [Doc. 30 at 62 ¶ 31]. The District contends that Ward's §

1981 claims for race discrimination and retaliation, which he brings pursuant to §

1983, must fail because, contrary to Ward's allegations, "[t]here is no evidence in

this case of any policy or custom on behalf of the [] District that influenced any

decision on the hiring or placement of African-American male principals[.]" [Doc.

54-1 at 6]. Ward responds by citing the undersigned's Report, Recommendation,

---

[11] As the District points out, [Doc. 54-1 at 2 n.2 (citation omitted)], Ward's second amended complaint includes a hostile work environment claim, see [Doc. 30 at 55-57 ¶¶ 18(a)-(f)]. As part of this claim, Ward alleges several adverse employment actions, including that he "was placed on a [PDP] and had to visit other schools to observe principals" and his "peers had to evaluate him and give him feedback on how he was doing during his visit with them"; that he was asked "to revise his [SIP] for the 2013-2014 school year"; that he "asked for extra help with discipline in his building and was not given that support"; and that he "asked for help when Whitesville . . . was over-crowded, causing two bus routes and the placement of trailers in the back of the building, [but] he was denied the support." [Id. at 55-57 ¶¶ 18(a)-(e)]. However, when the Court granted Ward leave to amend his complaint, it found that it would be futile to allow an amendment to assert this claim. [Doc. 28 at 38-39]. Thus, Ward was not authorized to assert a hostile work environment claim in his second amended complaint, and the claim is not properly before the Court and will not be further considered.

and Order on the District's earlier motion to dismiss and Ward's motion to amend his complaint, in which the Court found that Ward's complaint had sufficiently "identified the policies or customs that he contends led to the alleged § 1981 violations." [Doc. 58 at 9 (internal marks omitted)]. In reply, the District argues that "Ward confuses the standard for stating a claim to survive a motion to dismiss with the standard on summary judgment, which requires that Ward demonstrate *on the record* that there is a material issue of fact." [Doc. 64 at 4 (citation omitted)].

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," 42 U.S.C. § 1981(a), "and 'prohibits an employer from retaliating against its employee in response to the employee's complaint of race-based discrimination,'" Locascio v. BBDO Atlanta, Inc., 56 F. Supp. 3d 1356, 1363 (N.D. Ga. 2014), adopted at 1358 (citation omitted) (quoting Braswell v. Allen, 586 F. Supp. 2d 1297, 1310 (M.D. Ala. 2008)). Section 1981, however, "does not provide a cause of action against state actors; instead, claims against state actors or allegations of § 1981 violations must be brought pursuant to § 1983." Johnson v. Champions, Civil Action 12–0334–WS–M, 2014 WL 24216, at *13 (S.D. Ala. Jan. 2, 2014) (citation and internal marks omitted); see also Brown v. Sch. Bd. of Orange Cty., 459 F. App'x 817, 818-19 (11th Cir. 2012) (per curiam) (unpublished) (citation

omitted) ("Claims against state actors under § 1981 must be brought pursuant to . . . § 1983.").

A municipality and other government entities, such as the District, may not be held liable under § 1983 on a theory of *respondeat superior*. <u>Monell v. Dep't of Social Servs.</u>, 436 U.S. 658, 691 (1978). "[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." <u>McDowell v. Brown</u>, 392 F.3d 1283, 1289 (11th Cir. 2004) (citation omitted); <u>see also</u> <u>Sauls v. Pierce Cty. Sch. Dist.</u>, 399 F.3d 1279, 1287 (11th Cir. 2005) (citation omitted) ("To impose liability on a municipality under § 1983, the plaintiff must identify a municipal 'policy' or 'custom' causing the deprivation of federal rights.").

Ward "has two methods by which to establish a [municipality's] policy: identify either (1) an officially promulgated [municipal] policy or (2) an unofficial custom or practice of the [municipality] shown through the repeated acts of a final policymaker for the [municipality]." <u>Grech v. Clayton Cty.</u>, 335 F.3d 1326, 1329 (11th Cir. 2003) (citations omitted).[12] "A policy is a decision that is officially

---

[12] "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."

adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality," while "[a] custom is a practice that is so settled and permanent that it takes on the force of law." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997) (citations omitted); see also Grech, 335 F.3d at 1330 (second alteration in original) (citations and internal marks omitted) ("Because a county rarely will have an officially-adopted policy of permitting a particular constitutional violation, most plaintiffs . . . must show that the county has a custom or practice of permitting it and that the county's custom or practice is the moving force [behind] the constitutional violation."). To establish a policy or custom, Ward generally must show a persistent and widespread practice. McDowell, 392 F.3d at 1290 (citations omitted).

At the outset, the Court notes that Ward's reliance on the prior Report and Recommendation on the motion to dismiss is misplaced as he "fails to recognize that different standards govern a motion to dismiss and a motion for summary judgment." Cliatt v. Phenix City, No. 3:06–CV–471–MEF, 2008 WL 5397602, at *3 (M.D. Ala. Dec. 23, 2008); see also Scott v. Merchants Ass'n Collection Div., Inc.,

---

Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 403-04 (1997) (citation omitted). "Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." Id. at 404 (citation omitted); see also Richardson v. City of Leeds, 990 F. Supp. 1331, 1334 n.1 (N.D. Ala. 1997) (citation omitted).

No. 12–23018–CIV, 2012 WL 4896175, at *1 (S.D. Fla. Oct. 15, 2012) ("The standard for granting a motion for summary judgment is different from the standard for granting a motion to dismiss."); In re Kidd, 458 B.R. 612, 622 n.8 (Bankr. N.D. Ga. 2011) (citing Fed. R. Civ. P. 12(b)(6), 56(a)) ("[T]wo different standards apply to motions to dismiss and motions for summary judgment."). "To survive a motion to dismiss, a plaintiff must plead enough facts to state a claim to relief that is plausible on its face," whereas "summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Wolfe v. Glasgow, CASE NO. 3:08–CV–00813–J–25TEM, 2009 WL 10670888, at *1 (M.D. Fla. Apr. 17, 2009) (citations and internal marks omitted).

After considering the evidence submitted by the parties in the light most favorable to Ward, as required on a motion for summary judgment, the Court finds that Ward has not demonstrated the existence of a discriminatory policy or custom of the District.  Ward's second amended complaint alleges that "[i]t has been a custom of the . . . District to hire very few black male principals and to remove them from the positions of principal by demotion," asserting that the District "had only hired four black male principals when []his complaint was filed: Ed Smith, Marvin Grayson, Kevin Jones and [] [himself]," three of whom were demoted.  [Doc. 30 at 62-63].  He also alleged that it was "a custom of the . . . District

to have the longstanding and widespread practice of putting black principals in the most challenging schools." [Id. at 63]. In his response in opposition to the District's motion for summary judgment, Ward fails to identify any evidence in the record that supports these allegations. See generally [Doc. 58]; see also [Doc. 66]. Ward's affidavit, however, provides "statistical data from the time period that [he] was receiving adverse employment practice[s]," showing that "71% of the principals [in the District were] white and 29% [were] black," and includes lists of three African American principals who had been demoted, seven African American administrators who had been demoted, two African American staff members "who applied to be interviewed for principal positions but were denied an interview on several occasions and/or when they were allowed to interview the jobs were given to less qualified white staff," and four African American staff members who "interviewed for assistant principal positions but were denied an interview on several occasions and/or when they were allowed to interview the jobs were given to less qualified white staff[.]" [Doc. 60-1 ¶¶ 178-84].[13]

"Statistics without an analytic foundation are virtually meaningless," Evans v. McClain of Ga., Inc., 131 F.3d 957, 963 (11th Cir. 1997) (per curiam) (citation and internal marks omitted), and "raw statistics will not support an inference of

---

[13] Neither this statistical data nor any other evidence in the record supports Ward's claim that the District has a custom of placing African American principals in the most challenging schools. See [Doc. 58 at 23].

discrimination," Martin v. Dean, CIVIL ACTION NO. 1:06-CV-0497-MHS, 2008 WL 11324082, at *6-7 (N.D. Ga. Oct. 21, 2008) (citations omitted) (finding the plaintiff's statistical data "showing a disparity in the number of African-American versus Caucasian principals in North and South Fulton County" was unpersuasive for purposes of showing the defendant school district had "a widespread policy of encouraging the hiring of Caucasian principals for schools in North Fulton County while encouraging the hiring of African-American principals for schools in South Fulton County").  Ward's affidavit lacks necessary facts that would enable the Court to determine that his proffered statistics establish some discriminatory policy or custom in the District.  For instance, Ward has not provided the employment histories or qualifications of the African American employees who allegedly were denied promotions or of the Caucasian employees he asserts were promoted in their stead, nor has he provided statistical data showing the number of Caucasian employees who applied for or were demoted from these positions to enable a comparison.  See Hinson v. Clinch Cty., Ga. Bd. of Educ., 231 F.3d 821, 827 (11th Cir. 2000) (citation omitted) (finding that plaintiff "ha[d] not shown that it [was] statistically significant that she was the only woman to become a school principal in Clinch County or that no males were involuntarily removed" because she failed to present evidence concerning "how many other women applied and what their qualifications were, or . . . the track record of the unremoved males");

36

Evans, 131 F.3d at 963 (citation omitted) (rejecting the plaintiff's argument that he had established direct evidence of discrimination through evidence that "in the history of [defendants'] operations (650 employees in eight plants), there ha[d] only been three black supervisory employees," because plaintiff had "provided no other information (*i.e.*, whether any black employees ever applied for supervisory positions) to make this otherwise anecdotal information significant"); Howard v. BP Oil Co., 32 F.3d 520, 524 (11th Cir. 1994) (explaining that for the plaintiff's statistical evidence showing that defendant "ha[d] no black dealers in the predominantly white areas of north Atlanta" to be relevant to proving discriminatory intent, he "would have had to present evidence as to how many blacks applied and were rejected and evidence of the success rate of equally qualified white applicants" because "[a]necdotal information is no substitute for meaningful statistical analysis").

Moreover, the conclusory statement in Ward's affidavit that African American principals, assistant principals, and teachers "are promoted in [the District] at a disproportionate ratio to that of white staff who are promoted, and are also demoted at a disproportionate ratio to that of white staff," [Doc. 60-1 ¶ 181], is insufficient to establish the necessary policy or custom to support his § 1983 claim, as a "[p]laintiff cannot defeat summary judgment by relying upon conclusory allegations of discrimination," but rather, "[t]o survive summary

judgment, opposing affidavits must set forth *specific facts* showing that there is an issue for trial," Hill v. Oil Dri Corp. of Ga., 198 F. App'x 852, 858 (11th Cir. 2006) (per curiam) (unpublished) (citations omitted); see also Evans v. Books-A-Million, 762 F.3d 1288, 1295 (11th Cir. 2014) (citation omitted) (affirming the district court's finding that statements in the plaintiff's affidavit were "conclusory and speculative" as the "affidavit did not provide specific, supporting facts"); Shumate v. Selma City Bd. of Educ., 928 F. Supp. 2d 1302, 1324 (S.D. Ala. 2013), aff'd, 581 F. App'x 740 (11th Cir. 2014) (per curiam) (unpublished) (citations omitted) ("The Eleventh Circuit has consistently held that a party's conclusory allegations, without more, are insufficient to enable the non-moving party to withstand summary judgment."); Owens v. City of Fort Lauderdale, 174 F. Supp. 2d 1298, 1311 (S.D. Fla. 2001) (citations omitted) ("An affidavit containing conclusory assertions will not create an issue of fact sufficient to defeat a motion for summary judgment.").  Thus, Ward "has not set forth sufficient admissible evidence which could support a finding that the [District] maintains hiring or promotion policies that discriminate on the basis of race or gender" or that shows "a 'persistent and widespread practice' of race- or gender-based discrimination such that a custom of discriminatory employment practices may be inferred."  Polite v. Dougherty Cty. Sch. Sys., No. 1:05-CV-174 (WLS), 2007 WL 2258718, at *6 (M.D. Ga. Aug. 3, 2007), aff'd, 314 F. App'x 180 (11th Cir. 2008) (per curiam) (unpublished) (citations

omitted).  Accordingly, because "[t]he [District] cannot be held liable under § 1983 unless [Ward] proved the existence of an unconstitutional municipal policy," <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 128 (1988), Ward's claims under § 1981 fail. Therefore, although Ward "successfully alleged claims at the pleading stage[,] his [§] 1983 claims fail[] to survive on the evidence presented at the summary judgment stage," <u>Hawthorne v. Baptist Hosp. Inc.</u>, 448 F. App'x 965, 969 (11th Cir. 2011) (per curiam) (unpublished), and it is **RECOMMENDED** that the District's motion for summary judgment, [Doc. 54], be **GRANTED** as to Ward's § 1981 claims.[14]

B.    <u>Ward's Claims Under Title VII & § 1981</u>

Ward alleges race and sex discrimination and retaliation in violation of both Title VII and § 1981.[15]  [Doc. 30 at 44-59].  Title VII prohibits discrimination in

---

[14] Although Ward's § 1981 claims against the District fail because he cannot satisfy the § 1983 standard, the merits of his § 1981 discrimination and retaliation claims are still discussed hereinafter since the standards for such claims under § 1981 and Title VII are identical.

[15] While Ward's second amended complaint purports to bring his sex discrimination claim under both Title VII and § 1981, when this Court granted Ward leave to amend his complaint it made clear that "Ward's claim for sex discrimination [could] only proceed under Title VII, not § 1981," [Doc. 28 at 25 n.9], as "[§] 1981 does not prohibit discrimination on the basis of gender," <u>Givens v. Chambers</u>, 548 F. Supp. 2d 1259, 1269 (M.D. Ala. 2008).  Therefore, Ward's sex discrimination under § 1981 claim is not properly before the Court, and the Court will only address Ward's sex discrimination claim asserted under Title VII.

employment decisions on the basis of "race, color, religion, sex or national origin."
See 42 U.S.C. § 2000e-2(a)(1); Blue v. Dunn Constr. Co., 453 F. App'x 881, 883 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted); Bolton v. Potter, No. 8:03-CV-2205-T-27EAJ, 2006 WL 118286, at *5 (M.D. Fla. Jan. 13, 2006), aff'd, 198 F. App'x 914 (11th Cir. 2006) (per curiam) (unpublished) (citing Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977)); see also Branham v. Astrue, Civil Action No. 7:08-CV-123(HL), 2010 WL 419395, at *3 (M.D. Ga. Jan. 28, 2010) (citation omitted).  Title VII also prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a); see also Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008) (citation omitted).  As previously noted, § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts[16] . . . as is enjoyed by white citizens," 42 U.S.C. § 1981(a), and "prohibits an employer from retaliating against

---

[16] "Make and enforce contracts" encompasses "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  "Section 1981 thus prohibits a range of material adverse actions in private employment because of race."  Willmore-Cochran v. Wal-Mart Assocs., Inc., 919 F. Supp. 2d 1222, 1233 (N.D. Ala. 2013) (citation omitted).

its employee in response to the employee's complaint of race-based discrimination," Braswell, 586 F. Supp. 2d at 1310 (citation omitted).

Title VII and § 1981 use the same analysis for discrimination and retaliation claims.  See Worley v. City of Lilburn, 408 F. App'x 248, 250 (11th Cir. 2011) (per curiam) (unpublished) (citations omitted) ("The elements required to establish retaliation claims under § 1981 are the same as those required for Title VII claims."); Bryant v. Jones, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009) (citations omitted) (noting that discrimination claims brought under § 1981 and Title VII "are subject to the same standards of proof and employ the same analytical framework"); Butler v. Ala. Dep't of Transp., 536 F.3d 1209, 1215 (11th Cir. 2008) (analyzing discrimination claim under § 1981 under same framework as Title VII); Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) (stating that Title VII and § 1981 "have the same requirements of proof and use the same analytical framework").  Therefore, the Court will address Ward's Title VII discrimination and retaliation claims in connection with his § 1981 claims.

Ward may support his claims of discrimination and retaliation by offering either direct or circumstantial evidence.  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004) (citation omitted); Obester v. Lucas Assocs., Inc., Civil Action File No. 1:08–CV–03491–MHS–AJB, 2010 WL 8292401, at *25 (N.D. Ga. Aug. 2, 2010), adopted by 2010 WL 8304884, at *4 (N.D. Ga. Sept. 7, 2010) (citation

41

omitted).  "Direct evidence is 'evidence that, if believed, proves the existence of a fact without inference or presumption.'"  Wilson, 376 F.3d at 1086 (alterations omitted) (quoting Burrell v. Bd. of Trs. of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997)).  "Where direct evidence is present, summary judgment is not appropriate."  Bryant v. Jones, 696 F. Supp. 2d 1313, 1324 (N.D. Ga. 2010) (footnote and citation omitted).

In the absence of direct evidence, the Court evaluates claims of discrimination and retaliation by using the burden shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[17] See Young v. United Parcel Serv., Inc., 135 S. Ct. 1338, 1353 (2015); Slater v. Energy Servs. Grp. Int'l Inc., 441 F. App'x 637, 640 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted); Burke-Fowler v. Orange Cty., 447 F.3d 1319, 1323 (11th Cir. 2006) (per

---

[17] As the District points out in its motion for summary judgment, [Doc. 54-1 at 14-15], "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case," Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).  "Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent," which "exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  Id. (footnote, citations, and internal marks omitted).  "Under this alternative method, any substitute evidence must be comparably powerful in order to preserve to the prima facie case its gate-keeping function as ordained by the Supreme Court."  King v. Ferguson Enters., Inc., 971 F. Supp. 2d 1200, 1217 (N.D. Ga. Sept. 17, 2013), aff'd, 568 F. App'x 686 (11th Cir. 2014) (per curiam) (unpublished) (citation and internal marks omitted).

curiam) (citation omitted).  Under this framework, Ward must first present a prima facie case of discrimination or retaliation, but the framework "is 'not intended to be an inflexible rule.'" <u>Young</u>, 135 S. Ct. at 1353-54 (citation omitted).  "Rather, [Ward] may establish a prima facie case by showing actions taken by the [District] from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under Title VII." <u>Id.</u> at 1354 (citation and internal marks omitted).  "The burden of making this showing is not onerous." <u>Id.</u> (citation and internal marks omitted).

If Ward establishes a prima facie case as to each of his claims, an inference of discrimination and retaliation arises, and the burden shifts to the District to articulate legitimate, non-discriminatory and non-retaliatory reasons for its actions.  <u>Berman v. Orkin Exterminating Co.</u>, 160 F.3d 697, 702 (11th Cir. 1998) (footnote omitted); <u>see also</u> <u>Jefferson v. Burger King Corp.</u>, 505 F. App'x 830, 833 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted); <u>Entrekin v. City of Panama City Fla.</u>, 376 F. App'x 987, 997 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted); <u>Batts v. Silver Line Bldg. Prods. Corp.</u>, Civil Action File No. 1:08-CV-3355-WSD-ECS, 2010 WL 966860, at *9 (N.D. Ga. Feb. 22, 2010), adopted by 2010 WL 966861, at *2 (N.D. Ga. Mar. 12, 2010) (citation omitted).  The District's burden, one of production and not of persuasion, is "exceedingly light." <u>Smith v. Horner</u>, 839 F.2d 1530, 1537 (11th Cir. 1988) (citations and internal marks omitted);

see also Bagwell, 2011 WL 1497831, at *21 (citations omitted). "It is not necessary that the court believe the evidence; the court's analysis can involve no credibility assessment." Matthews v. City of Dothan, No. 1:04–CV–640–WKW, 2006 WL 3742237, at *5 (M.D. Ala. Dec. 18, 2006) (citation and internal marks omitted). "So long as the employer articulates 'a clear and reasonably specific' non-discriminatory [and non-retaliatory] basis for its actions, it has discharged its burden of production." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 770 (11th Cir. 2005) (per curiam) (citation omitted).

If the District meets its burden of production with respect to each claim, the inference of discrimination and retaliation is erased, and the burden shifts back to Ward to show that the District's articulated reason is merely a pretext for discrimination and retaliation. Entrekin, 376 F. App'x at 997 (citation omitted); Berman, 160 F.3d at 702 (footnote omitted); see also Wigfall v. St. Leo Univ., Inc., 517 F. App'x 910, 912 (11th Cir. 2013) (per curiam) (unpublished) (footnote omitted); Saunders, 360 F. App'x at 113, 115 (citations omitted). That is, "[o]nce the [District] proffers a legitimate, non-discriminatory [and non-retaliatory] reason, in order to survive summary judgment, [Ward] must proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the [District's] [] articulated reasons [are] pretextual." Dockery v. Nicholson, 170 F. App'x 63, 66 (11th Cir. 2006) (per curiam) (unpublished) (last alteration in original)

(citation and internal marks omitted); see also Bagwell, 2011 WL 1497831, at *25 (citation omitted).  Despite this burden-shifting framework, "[t]he ultimate burden of persuading the trier of fact that the [District] intentionally discriminated [or retaliated] against [Ward] remains at all times with [Ward]." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (citations omitted); see also Walker v. St. Joseph's/Candler Health Sys., Inc., 506 F. App'x 886, 888 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted).

### 1.   *Discrimination*

Ward alleges that he "was placed on a required PDP" and was ultimately reassigned "from his principal position to a teaching position" due to race and gender discrimination.  [Doc. 30 at 55-58].  The District argues that Ward's claims fail because he cannot make out a prima facie case of either race or gender discrimination, and even if he could, the District had legitimate, non-discriminatory reasons for its actions.  [Doc. 54-1 at 8-14 (emphasis omitted)].  Ward responds that there is sufficient evidence to establish a prima facie case of discrimination and that the District's proffered reasons are pretextual.  [Doc. 58 at 10-20].

### a.   Ward's Placement on a PDP

### i.   <u>Prima Facie Case</u>

To establish a prima facie case of discrimination, Ward must demonstrate that (1) he is a member of a protected class; (2) he was qualified for his position; (3) he was subjected to an adverse employment action; and (4) the District treated similarly situated employees outside of his class more favorably.  <u>Burke–Fowler</u>, 447 F.3d at 1323; <u>Rice-Lamar v. City of Ft. Lauderdale</u>, 232 F.3d 836, 842-43 (11th Cir. 2000) (citation omitted).  The District does not dispute the first three elements, but argues that Ward was not treated less favorably than similarly situated individuals outside his protected class.  <u>See</u> [Doc. 54-1 at 7-11].

"[D]isparate treatment of similarly situated employees of [a] different [race or gender] is enough to support an inference of [race or gender] discrimination."  <u>Silvera v. Orange Cty. Sch. Bd.</u>, 244 F.3d 1253, 1259 (11th Cir. 2001).  The Eleventh Circuit has held that the "proper test" for determining whether comparators are similarly situated to the plaintiff is whether he and his "proffered comparators were 'similarly situated in all material respects.'"  <u>Lewis v. City of Union City</u>, 918 F.3d 1213, 1218 (11th Cir. 2019) (en banc).  Although the sufficiency of the plaintiff's proffered comparators must be "worked out on a case-by-case basis" under this standard, a similarly situated comparator will ordinarily "have engaged in the same basic conduct (or misconduct) as the plaintiff"; "have been

subject to the same employment policy, guideline, or rule as the plaintiff"; "have been under the jurisdiction of the same supervisor as the plaintiff"; and "share the plaintiff's employment or disciplinary history[.]" Id. at 1227-28 (citations omitted). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." Rioux v. City of Atlanta, 520 F.3d 1269, 1277 (11th Cir. 2008) (alteration, emphasis, citation, and internal marks omitted).

Ward asserts that he was treated differently than similarly situated white, female principals. Ward alleges that, as part of his required PDP, he "was given additional work assignments" that required him "to visit other schools to observe [other] principals" who then "evaluate[d] him and [gave] feedback on how he was doing during his visit," which he found "humiliating and embarrassing." [Doc. 30 at 55-56 ¶¶ 18(a)-(b)]. Ward claims that "[n]o white principal in the . . . District has been placed on a PDP when their evaluation from the year before was marked with all [s]atisfactories" as his was. [Id. at 55 ¶ 17]. Ward identified six white, female principals as comparators: Wright, Anne Cook O'Brien ("O'Brien"), Tina Johnson Forbus ("Forbus"), Penny Johnson ("Johnson"), Carol Montgomery ("Montgomery"), and Peggy Smith ("Smith"). [Id. at 52-54 ¶¶ 14(a)-(f)]. He argues that these principals "were in the same position under the supervision of Dr. [] Barton" and "[t]heir annual evaluation measured them in the same way that

[he] . . . was measured, which is by performance and behavior, as defined by the Georgia Leadership Evaluation Instrument." [Doc. 58 at 12-13]. The District has presented evidence relating to these proffered comparators to support its argument that they were neither similarly situated to Ward nor treated more favorably for similar behavior. See [Doc. 54-2 ¶¶ 49-71; Doc. 55 (Freeman Exs. 2(a)-7(b)); Doc. 64 at 6-9]. The Court will discuss the evidence offered by the parties as it relates to each of Ward's proffered comparators in turn.

Wright previously served as principal at Whitesville. [Doc. 55 (Freeman Aff. ¶ 4)]. During her tenure as principal, Dr. Barton was Wright's supervisor. [Id. (Freeman Ex. 2(a) at 1-2, 5-7)]. When the District determined that Whitesville was not performing well under Wright's leadership, she was required to rewrite her SIP, [id. (Freeman Aff. ¶ 4)], and to observe other principals, [Doc. 62 at 9-10], and she was ultimately transferred to another elementary school, [Doc. 55 (Freeman Aff. ¶ 4); Doc. 60 ¶ 57]. The record does not reflect that Wright was ever placed on a PDP, but it likewise does not show that she sent an inappropriate email to staff, which was the conduct that caused Ward to be placed on a PDP. See [id.]. Based on these facts, Wright was subjected to comparable discipline for her underperformance as principal and she did not engage in conduct comparable to Ward that caused him to be placed on a PDP. Thus, Wright is not a similarly situated individual who was treated more favorably than Ward.

O'Brien, while serving as a principal at another school in the District, "was involved in an altercation with a teacher . . . wherein [she] grabbed for a computer mouse and physically touched [the teacher]." [Id. (Freeman Aff. ¶ 5)]. O'Brien received a letter of reprimand as a result of this incident. [Id.]. However, O'Brien is not a proper comparator because her "misconduct [] was meaningfully different." Chapman v. Alabama, 7:17-cv-01631-LSC, 2019 WL 5265329, at *9 (N.D. Ala. Oct. 17, 2019). Her altercation with a teacher was "a single incident, and [Ward] has presented no evidence that this misconduct ever repeated," id.,[18] whereas Ward is alleged to have been placed on a PDP in response to a "lengthy history of problems in his role as principal," [Doc. 55 (Barton Aff. ¶ 15)], which is discussed more thoroughly hereinafter with respect to the Court's consideration of the District's legitimate, non-discriminatory reasons for placing Ward on a PDP. Therefore, O'Brien is not a proper comparator.

Ward next identifies Forbus, who served as principal at Callaway Middle School ("Callaway"), as a comparator. [Id. (Freeman Aff. ¶ 7)]. He asserts that Forbus "exhibited behavior or conduct that required that she be removed mid-year from Callaway[.]" [Doc. 30 at 53]. However, the evidence shows that "Forbus

---

[18] Ward alleges that in addition to O'Brien's altercation with a teacher, she also allowed student test scores to decline. [Doc. 30 at 53]. However, Ward has not cited, nor has the Court found, any evidence in the record to support this allegation.

experienced medical complications following surgery" and "was placed on [Family and Medical Leave Act ("FMLA")] medical leave and transferred to a position at the . . . District central office" before ultimately resigning. [Doc. 55 (Freeman Aff. ¶ 7)]. Accordingly, it appears that there are "critical differences" between Ward and Forbus, Oirya v. Auburn Univ., Case No. 3:17-cv-681-WC, 2019 WL 4876705, at *17 (M.D. Ala. Oct. 2, 2019), and she, therefore, is not a proper comparator.

Johnson served as principal at a high school in the District. [Doc. 55 (Freeman Aff. ¶ 8)]. Ward asserts that "during her tenure as principal . . ., student test scores declined, teacher morale declined, and [a] large number of teachers left the school at an alarming rate." [Doc. 30 at 53]. The District's evidence shows that "Johnson succeeded a former principal to whom many teachers were personally loyal," and that "after the transition, teachers loyal to the former principal resigned or were transferred." [Doc. 55 (Freeman Aff. ¶ 8). Additionally, "[a]t the same time, the [s]tate of Georgia imposed the Teacher Keyes Effectiveness System, a system for evaluation of teacher performance," and "[t]eachers who disliked this new system also departed from the [] District." [Id.]. Thus, "Johnson was not placed on any [PDP] on the basis of teacher retention rates because teacher departure was not due to her conduct." [Id.]. Ward has not offered any evidence that refutes this explanation, nor has he identified any evidence showing that

student test scores declined under Johnson's leadership.  As such, the Court finds that Johnson is not a proper comparator.

Montgomery served as principal of Franklin Forest Elementary School ("Franklin Forest") during Ward's tenure as principal of Whitesville.  [Id. (Freeman Aff. ¶ 9)].  Like Ward, Montgomery was supervised by Dr. Barton.  [Id. (Freeman Ex. 7(b) at 259-61, 273, 275, 277, 293), (Barton Aff. ¶ 3)].  Ward asserts that Montgomery "allowed [] test scores to decline, poorly managed the student discipline at Franklin Forest [], and produced low teacher morale" and that she "was transferred to Hillcrest Elementary [("Hillcrest").]"  [Doc. 30 at 54].  Similar to Johnson, "Montgomery succeeded a former principal . . . who performed strongly and to whom [she] was unfavorably compared by her staff."  [Doc. 55 (Freeman Aff. ¶ 9)].  Then, "[w]hen Unity . . ., a school serving predominately impoverished students with extensive documented behavioral problems, closed, its students were transferred to Franklin Forest" and "Montgomery struggled to successfully address disciplinary issues with the new influx of students and received multiple complaints from parents[.]"  [Id.].  As a result, she was transferred to Hillcrest and "successfully transitioned to her new school," where she "currently continues to serve [] as principal."  [Id.].

There are some similarities between Ward and Montgomery in that both were supervised by Dr. Barton, [Id. (Freeman Ex. 7(b) at 259-61, 273, 275, 277, 293),

(Barton Aff. ¶ 3)], both received complaints from parents, [id. (Cagle Ex. 1), (Cagle Aff. ¶ 3), (Freeman Aff. ¶ 9)], and both faced challenges after Unity's closing when its students were transferred to their schools, see [id. (Cagle Aff. ¶ 4), (Freeman Aff. ¶ 9)].   Ward takes issue with the "District justif[ying] [Montgomery's] performance [because] she had an influx of new students" since he "also had an influx of new students that same school year[.]" [Doc. 58 at 13].  However, while Montgomery's problems as principal appear to have related directly to this influx of new students, the misconduct that resulted in Ward being placed on a PDP did not.  For instance, the complaints the District received from parents about Ward related to his decision to alter the teaching structure for gifted and advanced students while he was principal of Gardner Newman, prior to Unity's closing. [Doc. 55 (Cagle Aff. ¶¶ 3-4), (Cagle Ex. 1 at 9-11, 14-16), (Freeman Ex. 12(a) at 120)]. Additionally, notably absent from Montgomery's employment history is any misconduct similar to Ward's sending of the email to staff, [id. (Barton Aff. ¶ 14) (Barton Ex. 11 at 2-3), (Freeman Ex. 8 at 2-3); Doc. 62 at 35], and falsely reporting that teachers had been observed prior to their evaluations, [Doc. 55 (Barton Aff. ¶ 8), (Barton Ex. 6 at 1), (Freeman Aff. ¶ 9), (Freeman Exs. 7(a) & 7(b))]; see also Jarvis v. Siemens Med. Sols. USA, Inc., 460 F. App'x 851, 857-58 (11th Cir. 2012) (per curiam) (unpublished) (finding that plaintiff's proffered comparator was not similarly situated to him because "[t]he record show[ed] that [the comparator]

exhibited some of the same problems as [plaintiff], such as failing to submit weekly status reports and failing to complete assigned work projects," but "the record also show[ed] several significant deficiencies in [plaintiff's] performance that [were] not seen with respect to [the comparator]"). Therefore, Montgomery is not a proper comparator.

Finally, Ward has identified Smith, a former principal who "was charged with simple battery for slapping a five-year-old autistic child." [Doc. 30 at 54]. Ward alleges that "[s]he was never suspended" and instead "was moved to a position of Title I Specialist at Instructional Support Services." [Id.]. However, as the District points out, this was an isolated incident, which involved an "involuntary instantaneous action that was in self-defense." [Doc. 55 (Barton Ex. 15 at 1 (internal marks omitted))]. Moreover, Smith "was removed from her position as principal" as a result. [Id. (Barton Aff. ¶ 18)]. Thus, there was no reason to place Smith on a PDP to improve her performance as a principal, as Ward was, because she was removed from that role. Therefore, Smith is not a proper comparator. As such, Ward has failed to identify any similarly situated individuals outside of his protected class who were treated more favorably than him, and thus he has failed to establish a prima facie case of race or sex discrimination.

"If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." McQueen v. Ala. Dep't of Transp., 769 F. App'x 816, 822 (11th Cir. 2019) (per curiam) (unpublished) (citation omitted).  Accordingly, because Ward has failed to identify similarly situated employees outside his protected class who were treated more favorably, and because he has not identified any other "circumstantial evidence that creates a triable issue concerning the [District's] discriminatory intent," Smith, 644 F.3d at 1328 (citation omitted), Ward has not established a prima facie case of discrimination and, thus, his discrimination claims based on his placement on a PDP fail.

## ii.   Legitimate, Non-Discriminatory Reasons & Pretext

Even if Ward could establish a prima facie case of sex or race discrimination based on his placement on a PDP, his claims fail because the District has articulated legitimate, non-discriminatory reasons for its actions, which Ward has failed to show are pretextual.  The District argues that there was no discriminatory motivation behind Ward's placement on a PDP; instead, "Ward's supervisor knew of his extensive misconduct when she placed him on the PDP and did so on the basis of that knowledge."  [Doc. 54-1 at 12 (citation omitted)].  The District identified "Ward's history of inappropriate communications with faculty and staff," as well as "meting out excessive and inappropriate discipline, which

culminated with his inappropriate mass e-mail to teachers." [Doc. 64 at 11 (citation omitted)].

Because this reason constitutes a clear and reasonably specific non-discriminatory explanation for the District's decision to place Ward on a PDP, the District has discharged its burden of production, see Siler v. Hancock Cty. Bd. Of Educ., 510 F. Supp. 2d 1362, 1373-74 (M.D. Ga. 2007), aff'd, 272 F. App'x 881 (11th Cir. 2008) (per curiam) (unpublished) (finding that defendants satisfied their burden of articulating a legitimate, nondiscriminatory reason for the alleged adverse employment action by identifying plaintiff's "'poor communication skills with students, parents, and staff'"); Murdick v. Catalina Marketing Corp., 496 F. Supp. 2d 1337, 1358 (M.D. Fla. 2007) (finding that plaintiff's "history of poor work performance and attitude" constituted a legitimate, nondiscriminatory reason for defendant's decision to place him on a performance improvement plan); Smith v. Quintiles Transnational Corp., 509 F. Supp. 2d 1193, 1205 (M.D. Fla. 2007), and the burden shifts back to Ward to prove by a preponderance of the evidence that the reason provided by the District is pretext for a prohibited, discriminatory motive, see Tiggs-Vaughn v. Tuscaloosa Hous. Auth., 385 F. App'x 919, 923 (11th Cir. 2010) (per curiam) (unpublished); Bernard v. SSA Sec., Inc., 299 F. App'x 927, 930 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted).

To demonstrate pretext, Ward's evidence must reveal "'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the [District's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.'" Maples v. UHS of Ga., Inc., 716 F. Supp. 2d 1266, 1274 (N.D. Ga. 2010) (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)). Ward may establish pretext "by either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination." Wilson, 376 F.3d at 1088 (citations omitted); see also Watson v. Kelley Fleet Servs., LLC, 430 F. App'x 790, 791 (11th Cir. 2011) (per curiam) (unpublished) (citation and internal marks omitted) (noting that an employee may establish pretext "either by directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."). "To avoid summary judgment[, Ward] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." Brooks v. Cty. Comm'n of Jefferson Cty., 446 F.3d 1160, 1163 (11th Cir. 2006) (alteration, citation, and internal marks omitted).

In his response in opposition to the District's motion for summary judgment, Ward argues that the District's stated reasons for placing him on a PDP are pretextual because it "has altered, changed, and falsified the reasons and/or purpose for the Required [PDP] multiple times on multiple occasions[.]"[19]  [Doc. 58 at 14-15].  However, contrary to Ward's contention, the undisputed evidence of record supports the District's proffered reasons for placing him on a PDP, and its reasons for doing so have not materially changed.

On October 24, 2013, Ward sent an email to his staff with the subject "Positive Learning Environment," in which he wrote, in pertinent part:

> It is the teacher's responsibility to provide a well[]-managed, safe, and orderly environment that is conducive to learning and encourages respect for all.  I would strongly say that 98% of you do that on most days week after week.
>
> But there are other[s], who would like to make it my responsibility to control your classroom day in and day out.  That is your responsibility to do and that is what you are paid to do and if you cannot do it we need to pay someone who can.  It is not fair that you continue to damage the educational opportunity of our students.  Please decide if teaching is for you and do what you need to be successful or find you another profession.
>
> Starting Monday the administrative team will be spending three uninterrupted days in teacher's classrooms every week.  This is what has been asked of me by the [D]istrict and most principal[s] have

---

[19] While Ward asserts in a single sentence that the District's reason for placing him on a PDP has changed, his subsequent arguments focus instead on his contention that the District's reason for reassigning him to a classroom teaching position was pretextual, and he has not offered any evidence to show that the District's reason for placing him on a PDP has changed over time.  See generally [Doc. 58 at 14-20].

> already implemented the new procedures and I have not because of
> the teachers who continually call me to their rooms five times a day
> most weeks. Please prepare yourself mentally over the weekend
> for this change and if you cannot move in this direction you can give your
> resignation to Mrs. Huddleston and I will send it to [human
> resources] immediately.

[Doc. 55 (Barton Ex. 11 at 2-3), (Freeman Ex. 8 at 2-3); Doc. 62 at 35]. Subsequently,

Freeman and Dr. Barton held a meeting with Ward to discuss their displeasure

with this email along with other concerns, including "[c]omplaints from

employees on how [] Ward addresses various personnel concerns[.]"  [Doc. 55

(Barton Ex. 12 at 1); (Freeman Ex. 9 at 1)].  After this meeting, Freeman sent Ward

a "Letter of Directive" summarizing their discussion and informing Ward that he

would be placed on a required PDP.  [Id. (Freeman Ex. 8 at 1) (emphasis and all

caps omitted), (Barton Ex. 11 at 1); Doc. 62 at 44].  Referring to Ward's email,

Freeman wrote:

> This form of communication with your personnel to address a school-
> wide barrier to learning is not acceptable.  The content and tone of the
> email are not conducive to a school climate and culture which
> promotes success for all.  In addition, your actions do not employ
> effective communication strategies to positively communicate
> expectations and solicit input from school personnel to improve the
> total school performance.
>
> . . .
>
> As a result of these actions and other areas of concern observed, you
> are placed on [a] **Required [PDP]**, which will be frequently monitored
> with appropriate feedback provided on a regular basis.

[Doc. 55 (Freeman Ex. 8 at 1), (Barton Ex. 11 at 1); Doc. 62 at 44].

The undisputed evidence of record reveals that Ward sent an email to his staff on October 24, 2013, which was perceived as inappropriate and unprofessional by members of his staff, his supervisor, as well as human resources, and that subsequent to sending this email, Ward attended a disciplinary meeting with Dr. Barton and Freeman in which their concerns about this behavior were specifically addressed.  Then, Freeman sent Ward a letter in which she again explained why the email he sent was inappropriate, and explicitly identified this, along with "other areas of concern," as the reason that he was being placed on a PDP.  Importantly, Ward has failed to provide any evidence that would contradict this chronology or call into question the validity of the reason proffered for placing him on a PDP, which the District maintains was due to a history of misconduct culminating in the sending of this inappropriate email.[20]  Therefore, Ward has failed to establish that the District's reason for placing him on a PDP was

---

[20] Ward's affidavit asserts that pursuant to the Georgia Leadership Evaluation Handbook, he could only be placed on a PDP if he had received an unsatisfactory evaluation the year before, and thus, since his evaluation the previous year had been satisfactory, his placement on a PDP "is further evidence of [the District's] intent to discriminate against [him] by filling the record with false information." [Doc. 60-1 ¶¶ 121, 143-44 (citations omitted)].  However, the evidence cited by Ward to support this shows instead that PDPs are required when an individual receives "Needs Improvement" on any dimension of his evaluation, and that they "are encouraged for all personnel as part of continuing professional growth," [Doc. 62 at 64, 72], and thus does not show, as Ward contends, that PDPs are only permitted when an unsatisfactory evaluation was given the year before, see generally [Doc. 62 at 60-74].  Therefore, this argument fails to establish pretext.

pretextual.[21]   Accordingly, it is **RECOMMENDED** that the District's motion for summary judgment, [Doc. 54], be **GRANTED** as to Ward's race and sex discrimination claims as they relate to his placement on a PDP.

### b.   Ward's Reassignment to Teaching Position

### i.   <u>Prima Facie Case</u>

To establish a prima facie case of discrimination based on his removal from the principal position, Ward must show that: "1) he is a member of a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) he was replaced by someone outside his protected class or 'was treated less favorably than a similarly-situated individual outside his protected class.'" <u>DeLeon v. ST Mobile Aerospace Eng'g, Inc.</u>, 684 F. Supp. 2d 1301, 1327 (S.D. Ala. 2010) (quoting <u>Maynard v. Bd. of Regents</u>, 342 F.3d 1281, 1289 (11th Cir.

---

[21] Ward also claims that he was placed on a required PDP after his March 27, 2014, annual evaluation for the 2013-2014 school year.  [Doc. 58 at 16].  However, Ward has not provided evidence of a second PDP and the Court's own review of the record has not revealed one.  In any event, Ward's 2014 evaluation shows that he received "Needs Improvement" in three areas: "[p]lanning and implementing an appropriate curriculum," "[i]mplementing a staff performance evaluation program," and "[c]ommunicating effectively with professional personnel," [Doc. 62 at 86], and the "Georgia Leadership Evaluation Instrument Evaluation Manual" specifically requires that a PDP be created to address "[a]ny dimension rated as <u>Needs Improvement</u>" on an annual evaluation, [<u>id.</u> at 64, 72].  Thus, to the extent Ward was placed on a second PDP, the undisputed evidence of record demonstrates non-discriminatory reasons for the PDP, and Ward has not presented evidence to create a genuine factual dispute to support his contention that the District discriminated against him in placing him on a second PDP.

2003)).  Once again, the District disputes only the final element.  See [Doc. 54-1 at 7-11].

Because Ward's replacement, Brock, is a female, [Doc. 55 (Freeman Aff. ¶ 3)], the Court finds that he has established a prima facie case of sex discrimination, see Redd v. United Parcel Serv., Inc., No. CV–12–BE–3986–S, 2014 WL 4792234, at *1, 18 (N.D. Ala. Sept. 24, 2014), aff'd, 615 F. App'x 598 (11th Cir. 2015) (per curiam) (unpublished) (finding that the plaintiff, an African American male, had "established element four and ha[d] met his *prima facie* case as to [his] demotion" because he "presented undisputed evidence that, upon his demotion, [defendant] replaced him with . . . a white female"); see also Melton v. Nat'l Dairy LLC, 705 F. Supp. 2d 1303, 1319 (M.D. Ala. 2010) (citation omitted) (noting that a plaintiff "can bypass the 'similarly situated' prongs . . . by demonstrating instead that he was replaced by someone outside his protected class").  However, the Court agrees with the District that since Brock is African American, "Ward cannot establish a prima facie case [of race discrimination] on the basis of replacement[.]"  [Doc. 54-1 at 9 (citation omitted)].

The District argues that Ward was not treated less favorably than similarly situated individuals outside his protected class, asserting that none of his "proffered comparators engaged in the same basic conduct and was treated less favorably than Ward."  [Id. at 10].  Ward has identified the same six white female

comparators who held principal positions in the District as he did for his claims based on his placement on a PDP.  [Doc. 30 at 52-54].[22]

Beginning with Wright, the former principal of Whitesville who was transferred to another elementary school when Whitesville did not perform well under her leadership, [Doc. 55 (Freeman Aff. ¶ 4), (Freeman Ex. 2(a) at 1-2, 5-7); Doc. 60 ¶ 57], the District points out that Wright did not engage in misconduct similar to that of Ward in falsely reporting that he observed teachers prior to conducting their evaluations, [id. (Barton Aff. ¶ 8), (Barton Ex. 6 at 1)], and sending an inappropriate email to his staff, [id. (Barton Aff. ¶ 14) (Barton Ex. 11 at 2-3), (Freeman Aff. ¶ 4, Ex. 8 at 2-3); Doc. 62 at 35].  Moreover, Ward has not provided any evidence to show that Wright's performance after her transfer was unsatisfactory, such as would have necessitated her removal from her principal position.  Thus, Wright is not a valid comparator.

With regard to O'Brien, as the Court previously noted, because the misconduct that resulted in her discipline was an isolated incident, see [Doc. 55 (Freeman Aff. ¶ 5)], she is not a proper comparator to Ward, who the District alleges was removed from his principal position after a lengthy history of

_____

[22] Because the Court has already summarized the employment histories of these six alleged comparators in its discussion of Ward's discrimination claims based on his placement on a PDP, the Court will not repeat those facts, but will supplement with additional facts as relevant.

misconduct, [id. (Pugh Aff. ¶ 8)].  The same is true for Smith, who was disciplined for just a single act of misconduct, and given that she faced the same employment action that Ward here complains of—removal from the position of principal—she is not a proper comparator.  See [id. (Barton Aff. ¶ 18), Barton Ex. 15 at 1)].  Similarly, Forbus, another of Ward's proffered comparators, was also removed from her principal position (albeit for medical reasons and not due to any alleged misconduct on her part), [id. (Freeman Aff. ¶ 7)], and thus she too was not treated more favorably than Ward and is not a proper comparator.

Next, with regard to Johnson, the record shows that teacher retention rates suffered during her tenure as principal, but she was not removed from that position as a result.  [Id. (Freeman Aff. ¶ 8)].  As previously noted, the District attributed the decrease in teacher retention to teachers' loyalty to Johnson's predecessor and teachers' displeasure with a newly implemented state-wide teacher evaluation system.  [Id.].  Moreover, Johnson's employment records show that she received satisfactory evaluations for the years 2012-2013, 2016-2017, and 2017-2018,[23] [id. (Freeman Ex. 6 at 10, 15, 20, 73, 78)], indicating that there were no additional problems with her performance.  Therefore, although Johnson was not

---

[23] Importantly, these evaluations are the only evaluations that were submitted to the Court, and the record does not reflect that Johnson received less than satisfactory evaluations during other school years.  See generally [Doc. 55 (Freeman Ex. 6)].

removed from the principal position as Ward was, her employment history is materially different from Ward's, and she is not a proper comparator.  See Lewis, 918 F.3d at 1228 ("An employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects'—*e.g.*, who engaged in different conduct . . . or who have different work histories.").

Finally, while there are some similarities between Ward and Montgomery with respect to certain performance problems as principals, there are material differences in relevant conduct that prevent Montgomery from being a proper comparator.  Although Montgomery exhibited problems during her tenure as principal of Franklin Forest, including that she struggled to address disciplinary issues among the students, received complaints from parents, and faced low teacher morale, once she was transferred to another school, she "successfully transitioned to her new school[.]" [Doc. 55 (Freeman Aff. ¶ 9).  In addition to having some similar performance issues as Montgomery had at Franklin Forest, Ward also engaged in conduct that Montgomery did not.  Specifically, there is no indication in the record that Montgomery provided false information about the performance reviews of teachers under her supervision or that she sent any inappropriate email communication to her staff.  Thus, while the record shows that Montgomery had certain performance issues during her tenure at Franklin Forest, her performance improved at another school, and her performance issues

were not comparable to Ward's alleged misconduct.  See [id.].  Because there are material differences in the performance and conduct of Ward and Montgomery as principals, they were not similarly situated, and Montgomery is not a proper comparator.  See Hester v. Univ. of Ala. Birmingham Hosp., No. 18-15335, 2020 WL 62143, at *4 (11th Cir. 2020) (per curiam) (unpublished).  Therefore, Ward has failed to identify any similarly situated comparators, and he cannot establish a prima facie case of race discrimination.

Although Ward has not shown that he was treated less favorably than similarly situated comparators, his claim could still survive if he presents "enough non-comparison circumstantial evidence to raise a reasonable inference of intentional discrimination."  Lawson v. City of Pleasant Grove, Case No. 2:14–cv–0536–JEO, 2016 WL 2338560, at *7 (N.D. Ala. Feb. 16, 2016), adopted by 2016 WL 1719667, at *1 (N.D. Ala. Apr. 29, 2016) (citations and internal marks omitted).  However, the burden is on Ward to "present the mosaic tiles of circumstantial evidence to the [C]ourt" and "[t]he [C]ourt does not bear the burden of discerning this evidence for him[.]"  Redd, 2014 WL 4792234, at *23 (citation and internal marks omitted); see also Turner v. Fla. Prepaid Coll. Bd., 522 F. App'x 829, 833 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted) ("[W]e have never suggested that a plaintiff's generalized averment that [his] employer treated [him] differently than employees of a different race [or gender] can, alone, create a

'convincing mosaic of circumstantial evidence' from which a jury could find intentional discrimination based on race [or gender]."). Ward has shown that throughout his tenure as principal at Whitesville, he requested additional assistance from the District, particularly to help him combat the ongoing problem with student discipline faced by the school. [Doc. 60-1 ¶¶ 88-89, 120, 138 (citation omitted); Doc. 75 at 3; Doc. 75 at 8 (Pompey Aff.)]. Specifically, he requested that a third administrator be hired to work in the building and that an in-school suspension room be created. See [Doc. 75 at 3; Doc. 60-1 ¶ 89]. While Ward was never given these additional resources, his replacement received them the following school year. [Doc. 60-1 ¶ 138; Doc. 75 at 3, 7]; see also [Doc. 58 at 31]. As previously noted, Ward's replacement was an African American female. [Doc. 55 (Freeman Aff. ¶ 3)]. Ward has already established a prima facie case of sex discrimination by virtue of his being replaced by a female, and this additional circumstantial evidence is insufficient to save his race discrimination claim because although Ward asserts that discrimination was the reason he did not receive the requested resources, the individual who subsequently did receive those resources is of the same race as Ward. Therefore, Ward has failed to identify sufficient circumstantial evidence of race discrimination in the record to support his race discrimination claim based on his reassignment to a classroom teaching position, and this claim fails.

66

## ii.      **Legitimate, Non-Discriminatory Reasons & Pretext**

Because Ward has established a prima facie case of sex discrimination under Title VII, the burden now shifts to the District to articulate a legitimate, non-discriminatory reason for removing Ward from his principal position. Burdine, 450 U.S. at 1094; Bernard, 299 F. App'x at 930 (citation omitted).  The District argues that "when the Superintendent determined not to recommend that Ward return the next year as a principal, the Superintendent also was aware of [Ward's extensive history of] misconduct, in addition to the fact that Ward did not have tenure as a principal, and made his decision with these factors in mind." [Doc. 54-1 at 12 (citation omitted)].  This reason is sufficient for the District to satisfy "its 'exceedingly light burden' of articulating a legitimate, non-discriminatory reason for [Ward's reassignment]" and Ward "now has the burden to show that [the District's] reason is merely pretextual for unlawful discrimination." Boex v. OFS Fitel, LLC, 339 F. Supp. 2d 1352, 1363-64 (N.D. Ga. 2004) (citation omitted).[24]

---

[24] The District also asserts that, even if Ward could establish a prima face case of race discrimination based on his removal from the position of principal, the same legitimate, non-discriminatory reasons offered with respect to his sex discrimination claim also satisfy its burden with respect to his race discrimination claim, and because Ward has failed to show these reasons are pretextual, his race discrimination claim fails for this additional reason. See [Doc. 54-1 at 11-14; Doc. 64 at 9-12].  Accordingly, the analysis of pretext with respect to Ward's sex discrimination claim also applies to his race discrimination claim.

"Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." Tolley v. United Parcel Serv., No. Civ.A.1:05CV606TWT, 2006 WL 486523, at *5 (N.D. Ga. Feb. 27, 2006) (citation and internal marks omitted).  "Ultimately, an employee must meet the employer's stated reason 'head on and rebut it, and [he] cannot succeed by simply quarreling with the wisdom of that reason.'" Young, 432 F. App'x at 917 (citation omitted) (alteration in original).  Ward "cannot establish pretext by simply demonstrating facts that suggest [discriminatory] animus, but must specifically respond to each of [the District's] explanations and rebut them." Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec., 410 F. App'x 243, 247 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted).  "If [Ward] fails to demonstrate that there is a genuine issue of material fact concerning whether the [District's] articulated reasons for the adverse employment action are pretextual, then the [District] is entitled to summary judgment on the [discrimination] claim[s]." Johnson v. Advertiser Co., 778 F. Supp. 2d 1270, 1277 (M.D. Ala. 2011) (citing Combs, 106 F.3d at 1528).  Finally, despite this burden-shifting framework, the "ultimate burden of persuading the trier of fact that the [District] intentionally discriminated against [Ward] remains at all times with [Ward]." Burdine, 450 U.S. at 253 (citations omitted).

Ward argues that the District's stated reasons for reassigning him to a classroom teaching position are pretextual, citing several perceived inconsistencies in the record to support his contention that the District has "changed [its] defense several times[.]"  [Doc. 58 at 14-20].  Ward summarizes the history of the case and the District's reasons for his reassignment as follows: "a letter of directive dated November 5, 2013 stated that [he] was placed on a required [PDP] because of an email sent by [him] to the Whitesville . . . [s]taff"; on March 6, 2014, Dr. Barton discussed the successes of the PDP, including "the [t]ake [a]ways from school visits, and the [a]reas to [r]eview," and described this meeting as "[s]atisfactory"; "[o]n March 27, 2014, [he] received his Annual Evaluation Summary Report and [] was placed on a Required PDP"; on February 26, 2015, John Taylor ("Taylor"), an attorney for the District, "submitted a written position statement" to the Equal Employment Opportunity Commission ("EEOC") in which he wrote that "[i]n June 2012, [] Ward was reassigned as the Principal of Whitesville" in an effort "to improve student academic and behavioral achievement at [Whitesville]" and subsequently wrote that Ward's "reassignment was based on unsatisfactory annual evaluations, his inadequate job performance, and his inability to lead and administer an elementary school"; "[o]n March 6, 2014, which was the last meeting before Ward's annual evaluation, [he] was given a Satisfactory for completing everything on the PDP" and "[n]o incidents occurred

between March 6, 2014 and March 27, 2014 that warranted [a Needs Improvement]," but then "[o]n July 12, 2018, in the [District's] Brief in Support of its Pre-Answer Motion to dismiss . . . it stated [that] . . . [Ward's] poor evaluation under this [] instrument was the basis for his removal from the position of [p]rincipal" even though "Ward had an overall Satisfactory [e]valuation for the 2013-2014 school year"; "[i]n the [District's] June 21, 2019, [] Response to . . . Ward's Interrogatories," the District wrote that Ward "falsified teacher evaluations by submitting completed evaluations without actually observing teachers and had placed students in gifted curriculum programs without complying with mandatory evaluation and certification of students for those services," which Ward classifies as "deception" because he had actually "placed talented students in gifted classes which [was] acceptable under [g]ifted guidelines" and because he never falsified teacher evaluations; and, finally, in the District's response to his interrogatories it also wrote that Ward's "performance as principal was uniquely poor" and that Ward "did not know proper curriculum instruction for appropriate groups of students or how to evaluate the success of curricula," but "Ward gained 27.8 points during the 2012-2013 school year, which was the highest academic gain in the [] [D]istrict[.]"   Id. at 15-19 (emphasis, citations, and internal marks omitted)].  However, none of these arguments avail to demonstrate pretext.

First, Ward has referenced a March 6, 2014, meeting with Dr. Barton in which his progress on the PDP was discussed. [Id. at 15]. Ward's affidavit states that "[o]n March 6, 2014, Dr. Barton said [he] had satisfied the required [PDP] for correcting this behavior of sending the email that [he] sent to the entire staff." [Doc. 60-1 ¶ 129 (citation omitted)]; see also [id. ¶ 150]. The exhibit cited by Ward, titled "Progress Monitoring – [Whitesville]," appears to be an agenda for the March 6, 2014, meeting, but it is not clear who prepared this agenda. See [Doc. 62 at 2, 49]. Ward correctly points out that under the heading "Areas to review," there is a note under a subheading labeled "PDP" that states, "Meeting #1 Satisfactory," but there is also a note that states, "Making progress, but need to see ownership in Discipline Committee, academic program," [id. at 49]. Presuming that these notes were written by Dr. Barton, which is unclear, the mere notation that "Meeting #1" was "Satisfactory" does not directly refute the reasons proffered by the District for the decision not to recommend Ward for reemployment as principal since it was based on Ward's conduct over the years of his employment, which is unaffected by his allegedly successful navigation of the earlier discipline imposed.

Although Ward's affidavit asserts that no additional infractions occurred between this March 6, 2014, meeting and his March 27, 2014, evaluation in which he received "Needs Improvement" in three categories, [Doc. 60-1 ¶¶ 150-51], and

that he received this rating in two categories in which he had never previously been informed he was deficient: curriculum and performance and staff performance, [id. ¶¶ 146, 153 (citation omitted)], this also fails to establish that his removal from the principal position was pretextual.  Since Ward's inappropriate email was sent on October 24, 2013, in the midst of the 2013-2014 school year, this conduct was relevant to his evaluation for that year even though he had already been placed on a PDP for it.  Additionally, Ward's assertion that the District raised concerns about certain aspects of his performance for the first time in his annual evaluation is contradicted by the record evidence.  On Ward's 2013-2014 evaluation, under the category of staff performance, Dr. Barton wrote, "You inconsistently adhered to the state and system guidelines for implementing a staff performance program.  A Letter of Directive addressed these concerns."  [Doc. 55 (Freeman Ex. 12(a) at 147, 186), (Freeman Ex. 12(c) at 24-25), (Freeman Ex. 12(f) at 241), (Barton Ex. 13); Doc. 62 at 86].  Therefore, with regard to the area of staff performance, the evaluation reflects that Ward had been put on notice of his deficiency before this evaluation.  And, with regard to curriculum, Dr. Barton's notes on Ward's evaluation state, "You are beginning to develop your knowledge of PK-5 curriculum[, ]however, in this second year as principal of [Whitesville], there is inadequate progress in this area."  [Doc. 55 (Freeman Ex. 12(a) at 147, 186), (Freeman Ex. 12(c) at 24-25), (Freeman Ex. 12(f) at 241), (Barton Ex. 13); Doc. 62 at

86].  Since the annual evaluation concerned Ward's progress in developing his knowledge of PK-5 curriculum during his second year as principal at Whitesville, it is unclear how notice of this deficiency would have been assessed and communicated to him prior to the annual evaluation, and to the extent that this concern had not been specifically raised with Ward before his annual evaluation, he has nonetheless failed to show that it was a pretext for discrimination.  Thus, Ward's arguments in this regard are insufficient to establish pretext.

Next, with respect to any perceived inconsistencies relating to Taylor's explanations for Ward's reassignment, see [Doc. 58 at 16], the record clearly demonstrates that Taylor was actually discussing two different reassignments. First, Taylor wrote that in June 2012, Ward was reassigned from his position as principal at Gardner Newman to become the principal of Whitesville with the objective of "establish[ing] a strong administrative team to improve student academic and behavioral achievement at Whitesville[.]"  [Doc. 55 (Freeman Ex. 12(a) at 124); Doc. 62 at 18].  Then, Taylor explains that in 2014, Dr. Pugh "determined that [] Ward was not effective as an administrator" and recommended that he "be reassigned as a classroom teacher" based on a "lack of overall improvement in the academic and behavioral achievement of students, and [] Ward's overall performance as reflected in his 2013-14 annual evaluation[.]" [Doc. 55 (Freeman Ex. 12(a) at 126; Doc. 62 at 20].  Therefore, to the extent that

Ward argues that Taylor's discussion of Ward's reassignment was inconsistent, it is clear that Taylor was discussing distinct events and, thus, there is no inconsistency that establishes pretext.

Ward also argues that the District's reliance on his annual evaluation for the 2013-2014 school year is pretextual because he received an overall "Satisfactory" rating on that evaluation.  [Doc. 58 at 16].  However, as the District points out, [Doc. 64 at 9-10], Ward received "Needs Improvement" in three performance areas of this evaluation, [Doc. 55 (Barton Ex. 13 at 1); Doc. 62 at 86].  The Court's pretext "'inquiry is limited to whether the employer gave an honest explanation of its behavior,'" Redd, 2014 WL 4792234, at *15 (quoting Elrod v. Sears, Roebuck, & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)); see also Brooks, 446 F.3d at 1163 (emphasis, citation, and internal marks omitted) ("A reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason."), and the fact that Ward received an overall "Satisfactory" rating on his 2013-2014 evaluation does not refute that he was determined to "Need[] Improvement" in three performance areas cited by the District, so he has not met the District's reasons head on as the evidence indisputably shows that Ward's evaluation was not completely "Satisfactory" and thus, this is an insufficient basis to establish pretext.

74

Next, Ward claims that the District is incorrectly representing that he falsified teacher evaluations.  [Doc. 58 at 18 (citations omitted)].  Dr. Barton's affidavit explains that "[i]n the 2012-2013 school year, [] Ward turned in completed teacher evaluations, falsely representing that he had substantively observed teachers in the classroom as he was required to do, when in fact [he] conducted no such observations."  [Doc. 55 (Barton Aff. ¶ 8)].  In a March 15, 2013, email from Ward to Dr. Barton, Ward admits, "[t]here are five teachers who are in the formative observation process and have not received the one classroom observation but have received an [a]nnual [e]valuation."  [Id. (Barton Ex. 6 at 1)]. Ward's affidavit attempts to clarify that the problem was that he had delegated part of his responsibility to observe teachers to the school's Instructional Specialist, Dr. Short, which he had chosen to do in an effort to "help Dr. Short grow as an administrator."  [Doc. 60-1 ¶¶ 73-74, 80].  He also explained that his decision to have Dr. Short participate in the teacher observations was based on his prior experience as an administrator at other schools in the District, where it was customary for the administrator to conduct the evaluation, with the principal merely guiding the administrator through the process where questions or concerns arose.  [Id. ¶¶ 78-79].  While Ward's affidavit may explain the reasons for his actions, his affidavit and the other evidence he has submitted does not refute

the District's contention that he failed to comply with the required procedure for personally observing teachers prior to conducting annual evaluations.

Ward also takes issue with the District's characterization of his alterations to the gifted curriculum programs.  [Doc. 58 at 18 (citations omitted)].  His affidavit explains that before he made any changes to the gifted program, "[o]nce a student was placed in gifted classes in [sixth] grade, they remained in those classes through [eighth] grade no matter how they performed," and so "there was a need to address the old practice of how gifted classes were populated and maintained so that getting in advanced classes and staying in advanced classes were based on a student's performance and not gifted only, so that high performing gifted and talented students were both being served."   [Doc. 60-1 ¶¶ 26-27 (citations omitted)].  Once he implemented changes to this effect, however, parents began to complain.   [Id. ¶¶ 30-35].   Ward's affidavit asserts that the complaints he personally received from parents concerned "their child [] not [being] in classes with their friends, students that lived in their community, or went to church with them or played on their baseball team," or fears that Ward "had given unfair advantages to the black students," and that "[a]fter the parents met with [him], [they] then made [] phone calls to [c]entral [o]ffice[.]"   [Id. ¶¶ 34-36].  Cagle's affidavit explains that the "District received multiple complaints from parents concerning students qualifying for advanced content classes being removed from

those classes, and students being placed into the advanced content classes without meeting the qualifications for the same, at [] Ward's instruction," [Doc. 55 (Cagle Aff. ¶ 3)], and the District has submitted those complaints into evidence, see [id. (Cagle Ex. 1 at 7-11, 14-16, 19-23)].  Thus, although Ward may have had good intentions when making changes to the gifted curriculum, the uncontroverted evidence shows that those changes were negatively received by the students' parents, and Ward has not shown that the District's reliance on this to reassign him to a classroom teaching position was a pretext for discrimination.[25]

Moreover, Ward's "opinion about his own performance and disagreement with the [District's] evaluation of the appropriateness of his actions or the quality of his work does not necessarily raise a genuine issue of material fact as to pretext" and, in fact, "it is often irrelevant to the true issue, which is what the employer believed and whether this belief, true or not, was the reason for the adverse

---

[25] Additionally, although Ward points out that the District's response to his interrogatories states that he made these changes to the gifted curriculum "without complying with mandatory evaluation and certification of students for those services," [Doc. 58 at 18 (citation omitted)]; see also [Doc. 62 at 6-7], which he maintains is false because he merely "placed talented students in gifted glasses which is acceptable under [g]ifted guidelines," [Doc. 58 at 18], this does not affect the District's argument that the changes to the gifted curriculum resulted in numerous complaints from parents concerning their children's qualification for advanced curriculum classes, [Doc. 54-1 at 21], which is supported by the content of the complaints themselves, [Doc. 55 (Cagle Ex. 1) at 9-11, 14-16].  Thus, the Court finds that this fails to establish that the District's reliance on the changes to the gifted curriculum was pretext for discrimination.

action." Redd, 2014 WL 4792234, at * 20.  Thus, to the extent that Ward relies on statistics purportedly showing his achievements as principal, this too is insufficient to establish pretext.  Therefore, Ward has failed to establish that the District's reason for reassigning him was pretext for discrimination.  Accordingly, it is **RECOMMENDED** that the District's motion for summary judgment, [Doc. 54], be **GRANTED** as to Ward's discrimination claims based on his reassignment.

### 2.  *Retaliation*

Ward alleges that he "was retaliated against during the 2013-2014 [s]chool [y]ear because in October 2013, [he] . . . complained to the School Board and [c]entral [o]ffice [p]ersonnel about the fact that all of the low-income black students from Unity . . . were placed at Whitesville," and that he "was retaliated against for filing a grievance against Dr. [] Barton."  [Doc. 30 at 58].  The District argues that Ward's retaliation claims must fail because he cannot establish a prima facie case of retaliation and because "the [] District had legitimate, non-retaliatory, non-pretextual reasons for its decisions."  [Doc. 54-1 at 15-22 (emphasis and all caps omitted)].

To establish a prima facie case of retaliation, Ward "must show that (1) []he engaged in statutorily protected activity, (2) []he suffered a materially adverse employment action, and (3) some causal relationship existed between the two

events."[26] <u>Bailey v. City of Huntsville</u>, 517 F. App'x 857, 861 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted); <u>see also</u> <u>Hawk v. Atlanta Peach Movers</u>, 469 F. App'x 783, 785 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted); <u>Hawthorne</u>, 448 F. App'x at 968 (citation omitted); <u>Cleveland v. Sec'y of Treasury</u>, 407 F. App'x 386, 388 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted).  The District argues that Ward cannot make out a prima facie case of retaliation because he "did not did not engage in a protected activity" and "there is no causal link between the activities and the [] District's actions[.]"  [Doc. 54-1 at 15 (emphasis and all caps omitted)].

"An employee engages in protected activity if he opposes an employment practice based on a good faith, reasonable belief that the practice violates Title VII or [§] 1981."  <u>Canty v. Fry's Elecs., Inc.</u>, No. 1:09-cv-3508-WSD, 2012 WL 1038611, at *5 (N.D. Ga. Mar. 27, 2012) (citation omitted) (citing <u>Bryant</u>, 428 F. App'x at 898).  Under Title VII, "[s]tatutorily protected expression includes internal complaints of

---

[26] Additionally, the Supreme Court has concluded that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."  <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, 133 S. Ct. 2517, 2528 (2013) (citation omitted).  Thus, to survive summary judgment, Ward must show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the [District]."  <u>Nassar</u>, 133 S. Ct. at 2533; <u>see also</u> <u>Reynolds v. Winn-Dixie Raleigh, Inc.</u>, 85 F. Supp. 3d 1365, 1373 (M.D. Ga. 2015), <u>aff'd</u>, 620 F. App'x 785 (11th Cir. 2015) (per curiam) (unpublished) (footnote and citation omitted) ("To prove causation, [plaintiff] must show that his protected activity was the 'but-for' cause of [defendant's] decision to terminate him, not just a motivating factor.").

discrimination to superiors, as well as complaints lodged with the EEOC and discrimination-based lawsuits." Gerard v. Bd. of Regents State of Ga., 324 F. App'x 818, 825 (11th Cir. 2009) (per curiam) (unpublished) (citing Pipkins v. City of Temple Terrace, 267 F.3d 1197, 1201 (11th Cir. 2001)). Likewise, "[i]n the § 1981 context, '[s]tatutorily protected expression includes complaining to superiors about harassment in the work place, lodging complaints with the EEOC and participating in discrimination-based lawsuits.'" Page v. Winn-Dixie Montgomery, Inc., 702 F. Supp. 2d 1334, 1354 (S.D. Ala. 2010) (second alteration in original) (citation omitted).

Ward alleges that he "was retaliated against during the 2013-2014 [s]chool [y]ear," [Doc. 30 at 58], because he was placed on a required PDP shortly after a "meeting with [] Cagle in which [he] addressed his concerns about the discriminatory custom . . . of placing black students disproportionately at Whitesville" and because he was reassigned to a classroom teaching position shortly after filing "a grievance against Dr. Barton due to the misinterpretation and misapplication of the Georgia Leadership Evaluation Instrument," [Doc. 58 at 20-21]. Beginning with Ward's grievance about Dr. Barton's evaluation, the District argues that "[a] workplace grievance listing complaints unrelated to discrimination does not constitute a statutorily protected activity." [Doc. 54-1 at 17 (citations omitted)]. The Court agrees. As the District notes, "Ward's grievance

concerned his scores on his annual evaluation given by his supervisor, Dr. []
Barton, and Ward's contention that [Dr.] Barton 'misinterpreted' or 'misapplied'
the evaluation instrument," but "[t]hese allegations have nothing to do with
discrimination on the basis of membership in a protected class."   [Id. (citation
omitted)].   Ward's grievance does "not constitute the type of protected activity
contemplated by Title VII [or § 1981] because [Ward] failed to [show] that the
complaints included in [this grievance] had any relationship to [a protected
characteristic] or otherwise indicate that [Dr. Barton] was engaged in unlawful
employment practices." Satchel v. Sch. Bd. of Hillsborough Cty., 251 F. App'x 626,
628 (11th Cir. 2007) (per curiam) (unpublished).   Thus, it does not constitute
protected activity.

   With regard to Ward's claim of retaliation based on his alleged complaint of
discrimination during a meeting with Cagle, the District argues that "Ward does
not plead, let alone point to any evidence which could suggest, that the substance
of the communication included a complaint to any effect that the Unity students
were placed at Whitesville [] *because of Ward's membership in a protected class*." [Doc.
54-1 at 18 (footnote omitted)].   To satisfy his prima facie case of retaliation, Ward
must "show that he had a good faith, reasonable belief that the [District] was
engaged in unlawful *employment* practices; and [Ward] must show that this belief
objectively is reasonable in the light of the facts and record presented." Ross v.

City of Perry, 396 F. App'x 668, 671 (11th Cir. 2010) (per curiam) (unpublished) (emphasis added) (citation omitted); see also Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999) (emphasis added) (citation omitted) ("The objective reasonableness of an employee's belief that [his] employer has engaged in an unlawful *employment* practice must be measured against existing substantive law."). "[I]t is not enough for [Ward] to show that []he opposed garden-variety unfairness, harsh treatment in the workplace, or behavior that is prohibited under other laws; []he is *only* protected from retaliation if []he opposed or complained about a practice specifically prohibited by Title VII [or § 1981]." Lowry v. Regis Salons Corp., No. 1:15-cv-1970-SWD, 2006 WL 2583224, at *10 (N.D. Ga. Sept. 6, 2006).   Although Ward alleges that he complained about the District's discrimination against African American students, this type of discrimination is not discrimination *in employment* such as is made unlawful by Title VII and § 1981. See Hawkins v. Holy Family Cristo Rey Catholic High Sch., Case No.: 2:18-cv-00638-ACA, 2018 WL 6326485, at *4 (N.D. Ala. Dec. 4, 2018) (citation omitted) (finding that because plaintiff's "second amended complaint [did] not allege [that she] believed [defendant] engaged in unlawful employment practices," but rather alleged that she "opposed how teachers treated students," she "did not engage in protected activity" and thus "fail[ed] to state a claim for Title VII retaliation"); Holt v. Lewis, 955 F. Supp. 1385, 1387-88 (N.D. Ala. 1995), aff'd, 109 F.3d 771 (11th Cir.

1997) (unpublished) (finding that plaintiff's Title VII retaliation claim failed because his allegation that his employment contract was not renewed after he complained that a student at the defendant-university was being sexually harassed "in no way indict[ed] any *employment* practice on behalf of [defendant]," as plaintiff "ha[d] not alleged that this student was discharged from employment, not chosen for employment, or otherwise denied any privilege of employment by [defendant]").  Because Ward has failed to show that he engaged in protected activity, he cannot establish a prima facie case of retaliation,[27] and it is

---

[27] Because Ward is unable to satisfy the first element of his prima facie case of retaliation as he has failed to show that he engaged in protected activity, the Court need not address whether his protected activity was the but-for cause of the alleged adverse employment actions.  Moreover, for the reasons already discussed in connection with his discrimination claims, even if the Court reached the pretext stage of the analysis, Ward has failed to create any genuine issue of fact regarding the District's proffered legitimate, non-retaliatory reasons of his reassignment and placing him on a PDP.  Accordingly, even if he could establish a prima facie case of retaliation, the District's motion for summary judgment on this claim is due to be granted for this additional reason.  See Gilbert v. U.S. Dep't of Justice, 252 F. App'x 274, 277 (11th Cir. 2007) (per curiam) (unpublished) (affirming the district court's grant of summary judgment for the defendant on plaintiff's retaliation claim because the plaintiff "offer[ed] no evidence contesting the [defendant's] legitimate, non-[retaliatory] reason for not hiring him"); Wright v. Duval Cty. Sch. Bd., 510 F. Supp. 2d 941, 948 (M.D. Fla. 2007) (granting the defendant's motion for summary judgment because the plaintiff had "failed to identify evidence from which a reasonable jury could conclude that the [defendant's] asserted reasons for not hiring her were in fact pretexts for prohibited retaliation[.]"); Paschal v. McHugh, Civil Action No. CV–12–S–2985–NE, 2015 WL 3836965, at *31 (N.D. Ala. June 22, 2015), aff'd, 648 F. App'x 898 (11th Cir. 2016) (per curiam) (unpublished) (footnote, citation, and internal marks omitted) (granting summary judgment for the defendant on plaintiff's Title VII retaliation claim after finding that her reliance on "pure conjecture and speculation" was insufficient to support her argument

**RECOMMENDED** that the District's motion for summary judgment, [Doc. 54], be

**GRANTED** as to Ward's retaliation claims.

## C.     Violation of the First Amendment, Pursuant to § 1983

Ward alleges that his First Amendment rights were violated when Dr. Pugh

denied the appeal of his grievance against Dr. Barton to the Troup County Board

of Education.  [Doc. 30 at 59-62 ¶¶ 22-30].  Ward asserts that his grievance was not

untimely because it was filed within ten working days, which he maintains is the

proper measure of the ten-day requirement, and therefore he asserts that Dr. Pugh

improperly rejected his grievance based on ten calendar days.  [Id. at 58 ¶ 20, 60-

61 ¶¶ 25-27].  In this regard, Ward claims that "Dr. [] Pugh's actions which denied

[him] . . . the right to speak to the Troup County Board of Education [were] based

on a policy which was unconstitutional" and that his First Amendment rights were

violated when Dr. Pugh "used unbridled discretion to prohibit [his] speech."  [Id.

at 61-62 ¶ 28 (citation omitted)].  The District argues that Ward's claim is based on

"an unidentified policy or custom" and that, because "[t]here is no evidence in this

case of any policy or custom on behalf of the [] District that influenced . . . the

denial of [Ward's] grievances," his First Amendment claim must fail.  [Doc. 54-1

_____

that defendant's proffered reasons for the alleged adverse employment actions
were pretextual); see also Shuler, 441 F. App'x at 715 (citation omitted) (explaining
that speculation or conjecture cannot create a genuine issue of material fact to
preclude summary judgment); Howard, 276 F. App'x at 941 (citation omitted)
(same).

at 5-6 (citation omitted)].  Moreover, the District argues that there has been no First Amendment violation "because [Ward] was not prevented from speaking on a matter of public concern[.]"  [Doc 54-1 at 22-24 (emphasis and all caps omitted)].[28]

Ward must assert his First Amendment claim against the District "through the vehicle of [§] 1983."  Polion v. City of Greensboro, 26 F. Supp. 3d 1197, 1217 (S.D. Ala. 2014), aff'd, 614 F. App'x 396 (11th Cir. 2015) (per curiam) (unpublished) (citation omitted).  As previously discussed, "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused

---

[28] The District also argues that Ward's response to its motion for summary judgment "ignores the [] District's First Amendment argument, and therefore [its] position on this claim is unopposed."  [Doc. 64 at 15].  The Court agrees and finds that because Ward has failed to respond to the District's arguments regarding his First Amendment claim in his responsive brief, the District's motion as to this claim is unopposed and Ward's First Amendment claim is deemed abandoned. See Hayes v. Rockdale Cty., 1:14-cv-2764-WSD, 2016 WL 154110, at *2 (N.D. Ga. Jan. 11, 2016) (citations omitted) (deeming defendants' motion for summary judgment on certain grounds unopposed as plaintiff failed to respond to those grounds); Kramer v. Gwinnett Cty., 306 F. Supp. 2d 1219, 1221 (N.D. Ga. 2004), aff'd, 116 F. App'x 253 (11th Cir. 2004) (unpublished) (citation omitted) ("[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed."); Welch v. Delta Air Lines, Inc., 978 F. Supp. 1133, 1148 (N.D. Ga. 1997), adopted at 1138 (footnote omitted) ("[U]nder Local Court Rule 7.1 of the United States District Court for the Northern District of Georgia, factual and legal claims to which there is no response should be treated as unopposed.").  However, the merits of this claim that Ward asserted in his surreply will also be addressed.  See [Doc. 66 at 20-21].

the violation." McDowell, 392 F.3d at 1289 (citation omitted); see also Camp v. Corr. Med. Servs., Inc., 668 F. Supp. 2d 1338, 1350 (2008), aff'd in part, 400 F. App'x 519 (11th Cir. 2010) (per curiam) (unpublished) (citing Garvie v. City of Fort Walton Beach, 366 F.3d 1186, 1188 (11th Cir. 2004)) ("To survive summary judgment [on a § 1983 claim], a plaintiff must identify: (1) an official policy, (2) a settled custom, or (3) the actions of a 'policymaker' that caused the alleged constitutional violation."). "Municipal liability may arise with regards to an employment decision . . . provided that the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." Willingham v. City of Valparaiso Fla., 638 F. App'x 903, 906 (11th Cir. 2016) (per curiam) (unpublished) (citation and internal marks omitted); see also Polion, 26 F. Supp. 3d at 1217 (internal marks omitted) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)).

"Even if [] [Ward] Could establish that [Dr. Pugh] . . . violated [his] First Amendment rights, []he has not . . . presented any evidence to support[] a § 1983 claim against the [District.]" Taylor v. City of Atlanta Police Dept., No. 1:04-CV-1127-WSD, 2006 WL 304038, at *12 (N.D. Ga. Feb. 7, 2006). Ward "simply has not offered any evidence of, nor even attempted to identify, an official policy or custom" that resulted in the violation of his First Amendment rights. Id. Because Ward's First Amendment claim is based on Dr. Pugh's decision to deny the appeal

of his grievance, Ward must show that Dr. Pugh was a final policymaker for the District and that he acted pursuant to an official policy or custom of the District. See Tisdale v. Gravitt, 51 F. Supp. 3d 1378, 1394 (N.D. Ga. 2014) (citations omitted). Although Ward has alleged that Dr. Pugh's actions were "based on a policy which was unconstitutional," [Doc. 30 at 61 ¶ 28], he fails to identify the policy he relies upon, and he has not offered any evidence to show that Dr. Pugh had final policymaking authority in this regard or that his act of denying Ward's appeal was based on an official District policy.   Therefore, Ward's First Amendment claim against the District cannot satisfy the § 1983 standard,[29] and it is **RECOMMENDED** that the District's motion for summary judgment, [Doc. 54], be **GRANTED** as to this claim.

## IV. CONCLUSION

For the foregoing reasons, Ward's motion for leave to file a surreply, [Doc. 68], is **GRANTED**, and the District's motion to exclude Ward's surreply, [Doc. 67], is **DENIED**, and it is **RECOMMENDED** that the District's motion for summary judgment, [Doc. 54], be **GRANTED** in its entirety.

---

[29] Because the Court finds that Ward's claim does not satisfy the requirements of § 1983, the Court need not address whether Ward was speaking as a private citizen on a matter of public concern, as would be required for him to establish a violation of his First Amendment rights.   See Garcetti v. Ceballos, 547 U.S. 410, 417 (2006) (citations omitted) ("[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern.").

The Clerk is **DIRECTED** to terminate this referral.

**IT IS SO ORDERED** and **RECOMMENDED** this 6th day of March, 2020.


RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE